John AURIEMMA et al., Plaintiffs,

v.

CITY OF CHICAGO, Defendant.

No. 84 C 1224.

United States District Court,
N.D. Illinois, E.D.

Aug. 31, 1990.

John L. Gubbins, Richard P. Caro, Chicago, Ill., for plaintiffs.

Earl L. Neal, Langdon D. Neal, Earl L. Neal and Assoc., D. Rainell Rains, Henry F. Field, James D. Montgomery, Corp. Counsel, City of Chicago, Phillip H. Snelling, Matthew J. Piers, Gessler, Flynn, Fleischmann, Hughes & Socol, Ltd., Shelli D. Williams, pro hac vice, Chicago, Ill., for defendants.

## MEMORANDUM OPINION
## AND ORDER

HOLDERMAN, District Judge:

On August 20, 1990 a divided *en banc* Seventh Circuit affirmed this court's ruling that Superintendent of Police Fred Rice was not entitled to qualified immunity from suit with regard to the claims presented by plaintiffs in Counts III and V of the Second Amended Complaint.[1] *Auriemma v. Rice*, 910 F.2d 1449 (7th Cir.1990). The parties agree that the stay entered when Mr. Rice appealed this court's ruling on the qualified immunity issue should no longer preclude this court from ruling on the pending motion filed by the City of Chicago (the "City") for summary judgment on all remaining counts against it. For the reasons stated herein, the City's motion will be granted.

## BACKGROUND FACTS

After the late Mayor Harold Washington appointed him as Superintendent of the Chicago Police Department in August of 1983, Fred Rice proceeded to reorganize the exempt rank positions of the department.[2] As part of the reorganization of these top management positions, Superin-

---

1. This court's ruling with regard to Count IV, which had denied Mr. Rice qualified immunity on plaintiffs' claims under 42 U.S.C. § 1985(3), was reversed by the Seventh Circuit.

2. The exempt rank officers "are the highest level managers of the Chicago police department; they create and execute police policy in the supervision and direction of over 15,000 police employees." *Auriemma, supra,* 910 F.2d at 1451.

tendent Rice reassigned or demoted twenty-five white officers from the exempt ranks. He did not demote any black officers. He promoted thirteen black officers to the exempt ranks. Plaintiffs are some of the white police officers who were demoted on December 2, 1983. *See Auriemma, supra,* 910 F.2d at 1451. Plaintiffs filed their original complaint in this action on February 8, 1984, challenging the constitutionality of Superintendent Rice's actions.[3] Plaintiffs' remaining claims against the City, as set forth in the Second Amended Complaint, are described below.

*Count II: Political Discrimination*

Count II of the Second Amended Complaint alleges, in relevant part, that:

Defendant Rice was appointed Superintendent of the Chicago Police Department by defendant Harold Washington subsequent to his election as Mayor of the City of Chicago. Defendant Rice was and is a political supporter of Washington and he conferred with Washington and his aides concerning plaintiffs' demotions.

Defendant Rice at defendant Washington's insistence and direction ordered all of plaintiffs' demotions.

Plaintiffs had supported candidates for Mayor other than defendant Washington and failed to provide any support for Washington during either his primary campaign or his campaign for Mayor. Plaintiffs' demotions from their positions within the upper ranks of the Chicago Police Department were ordered by defendants Washington and Rice to punish them for their failure to support Washington in his campaign for Mayor and to make room for appointments of Washington supporters into those positions.

(Second Amended Complaint, Count II, ¶¶ 48–51.) Plaintiffs seek relief pursuant to 42 U.S.C. § 1983 for the alleged violation of their First Amendment rights. (Id., ¶ 52.)

After the City moved to strike Count II on the ground that the plaintiffs had ignored this court's order to provide defendants with a more definite statement concerning the policy or practice at issue in Count II, plaintiffs filed a statement under Fed.R.Civ.P. 12(e) ("Rule 12 Statement"). Paragraph one of plaintiffs' Rule 12 Statement alleges:

It is the policy of the City of Chicago that the Superintendent of the Chicago Police Department have full discretionary authority to appoint, remove, and reassign officers to and from exempt ranked positions, with or without cause, at will, and that the Superintendent's decisions not be subject to review by municipal authority even where such decisions, acts or policies may violate the constitutional and civil rights of the affected officers, and that it is the policy, custom and practice of the City of Chicago that the Superintendent by Municipal Ordinance be the official with the final policy making authority with respect to all employment decisions respecting exempt rank positions in the Police Department and that there be no restraints imposed by the City to prevent the Superintendent from basing his decisions, policies and actions on an officer's race or constitutionally protected exercise of political rights, and finally that the policies, acts and decisions of the Superintendent in this area be binding upon the City of Chicago as its policies, acts an[d] decisions.

(Plaintiffs' Rule 12 Statement, pp. 1–2.)[4]

*Count III: Race Discrimination*

Count III alleges that the plaintiffs' race "was a substantial or motivating factor" in

---

**3.** Although there have been several amended complaints filed, the substance of the allegations has remained the same. Since the filing of the Second Amended Complaint, however, plaintiffs (1) have voluntarily dismissed the Estate of Mayor Harold Washington and the Chicago Police Department as defendants; and (2) have voluntarily dismissed Count I of the pleading.

**4.** The court notes that plaintiffs have never sought leave to amend the Second Amended Complaint in order to properly allege such a custom or policy. In fact, each remaining count of the Second Amended Complaint contains the following allegation:

It has been the longstanding custom and policy of the Police Department and of each successive Police Superintendent since Orlando

the decision to demote them. (Second Amended Complaint, Count III, ¶ 56.) The demotions are alleged to have been "part of a plan and agreement between Washington, Rice and other black city employees, formulated during meetings among them in the summer and fall of 1983" to demote and harass white Chicago police officers who held supervisory command positions. (Id., ¶ 57.) With regard to municipal policy, Count III alleges:

> The above knowing and intentional patterns and series of acts of discrimination by defendants Washington and Rice represent the custom and policy of the City of Chicago as implemented by its Chief Executive Officer, Harold Washington, and the highest ranking officer in the Chicago Police Department, Fred Rice, of harassing and demoting white officers who held supervisory command positions in order to make these positions available to black officers.

(Id., ¶ 58.)

Count III seeks relief under 42 U.S.C. §§ 1981 and 1983.

*Count IV: Civil Rights Conspiracy*

Count IV alleges that the defendants violated 42 U.S.C. § 1985(3) by conspiring to violate plaintiffs' civil rights. Counsel for plaintiffs has asserted that the City is a named defendant to Count IV. (*See* Transcript of Proceedings of 3/6/89, pp. 5–6, submitted as Supplement to Plaintiffs' Response to Motion for Summary Judgment.)

*Count V: Retaliation*

Finally, Count V alleges that since the plaintiffs filed their original complaint in this case, the defendants have subjected them to a "pattern of harassment and retaliatory treatment" in violation of 42 U.S.C. § 1983. (Second Amended Complaint, Count V, ¶ 65.) Among other things, the pleading alleges, Mr. Rice and the City have failed to consider plaintiffs for promotions or transfers to better as-

signments since they filed suit in February of 1984 and "have launched a campaign to harass and embarrass plaintiffs and to disrupt their careers as police officers...." (Id., ¶ 70.)

Count V alleges that Mr. Rice's retaliatory actions were taken as an agent of the City of Chicago. (Id., ¶ 71.) Count V also asserts municipal liability on the following basis:

> The above knowing and intentional pattern of acts and discrimination by defendants Rice and Washington represent the custom and policy of the City of Chicago as implemented by its chief executive officer, Harold Washington, and the highest ranking officer in the Chicago Police Department, Fred Rice, of harassing and retaliating against police officers who have filed federal lawsuits against them.

(Second Amended Complaint, Count V, ¶ 73.)

## DISCUSSION

I. *Counts II and III: Political Discrimination and Race Discrimination.*

Relying primarily upon the Supreme Court's decision in *City of St. Louis v. Praprotnik*, 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988), the City argues that plaintiffs have been unable to allege, let alone establish, a municipal policy that would subject the City to liability under Counts II or III.[5] Furthermore, the City contends, plaintiffs have been unable to establish municipal liability based upon a widespread practice " 'so permanent and well settled as to constitute "a custom or usage" with the force of law.' " *Praprotnik*, 108 S.Ct. at 925–26, *quoting Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167–168, 90 S.Ct. 1598, 1613–14, 26 L.Ed.2d 142 (1970). To the contrary, the City argues that municipal employment policy—as es-

---

Wilson for persons in the plaintiffs' job categories to be hired, fired, promoted, demoted, or transferred solely on the basis of merit. In particular it has been the longstanding custom and policy to fire or demote persons in such categories only when there is cause to do so.

(Second Amended Complaint, Count I, ¶ 45, incorporated by reference in ¶ 2 of Counts II, III, IV and V.)

5. As discussed *infra*, the City has made a similar argument with regard to Count V.

tablished by municipal officials possessing final policymaking authority with regard to employment policies and practices for the City of Chicago—prohibits discrimination based upon either race or political affiliation.

### A. Municipal Liability Premised Upon Superintendent Rice's Status as a Final Policymaker.

1. *Praprotnik's Holding with Regard to Municipal Liability.*

In *Praprotnik* the Supreme Court reexamined the issue of "when a decision on a single occasion may be enough to establish an unconstitutional municipal policy" under § 1983. *Praprotnik, supra,* 108 S.Ct. at 924. Justice O'Connor, writing for a plurality, held that a municipality could not be held liable under § 1983 "for the unconstitutional transfer of a city employee where the officials who arranged for the transfer did not possess final policymaking authority with respect to employment decisions and had not been delegated such authority." *Mandel v. Doe,* 888 F.2d 783, 792 (11th Cir.1989) (explaining holding of *Praprotnik* ).

The Court's decision began by "reiterating that the identification of policymaking officials is a question of state law." *Praprotnik, supra,* 108 S.Ct. at 924. The Court was confident that state law, which the Court noted may include valid local ordinances and regulations, would always "direct a court to some official or body that has the responsibility for making law or setting policy in any given area of a local government's business." *Id.* at 924–25. The Court emphasized that "the authority to make municipal policy is necessarily the authority to make *final* policy." 108 S.Ct. at 926. "Where an official's discretionary decisions are constrained by policies not of that official's making," the Court explained, "those policies, rather than the

subordinate's departures from them, are the act of the municipality." *Id.*

The *Praprotnik* plurality emphasized again the principle, first strongly articulated in *Pembaur v. City of Cincinnati,* 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986), that municipal liability may attach to a single decision of a municipal official if that municipal official is "responsible under state law for making policy *in that area* of the city's business." 108 S.Ct. at 924 (emphasis in original, and citing *Pembaur,* 106 S.Ct. at 1297–1300, and n. 12.)[6]

The Fifth Circuit has recently noted the significance of this aspect of municipal liability jurisprudence:

> This language [of *Pembaur* ] is significant in two respects. First, it indicates that policymaking authority in areas other than the one implicated is not sufficient to impose liability on the City. *Pembaur* established that no matter how much power an official has, no municipal liability exists if that official does not set the policy at issue. Second, the language indicates that the employee must have *final* policymaking authority in that area. In *Pembaur,* Justice Brennan distinguished the exercise of power and discretion in the enforcement of a policy from the delegation of final authority to make that policy.

*Worsham v. City of Pasadena,* 881 F.2d 1336, 1341 (5th Cir.1989).

And finally, in a recent majority opinion affirming *Praprotnik's* analysis, the Supreme Court held that the "identification of those officials whose decisions represent the official policy" of a municipality "is itself a legal question to be resolved by the trial judge *before* the case is submitted to the jury." *Jett v. Dallas Independent School District,* —— U.S. ——, 109 S.Ct. 2702, 2723, 105 L.Ed.2d 598 (1989) (emphasis in original).

---

**6.** On remand in *Praprotnik,* the Eighth Circuit found that the officials responsible for Mr. Praprotnik's transfer and layoff "were not vested with final policymaking authority for making municipal policy in the area of personnel administration and layoffs." *Praprotnik v. City of* *St. Louis,* 879 F.2d 1573, 1575 (8th Cir.), *reh'g denied* 1989 WL 65742, 1989 LEXIS 11483 (1989). "At most," the appellate court explained, "these officials were entrusted with the authority for making discretionary personnel decisions in their departments." *Id.*

## 2. *Illinois State Law and the Chicago Municipal Code.*

■ Illinois state law provides that the corporate authority of a municipality is its "city council or similar body...." Ill.Rev. Stat. ch. 24, ¶ 1-1-2(2). It further provides that "[t]he corporate authorities of each municipality may pass all ordinances and make all rules and regulations proper or necessary, to carry into effect the powers granted to municipalities...." Ill.Rev. Stat. ch. 24, ¶ 1-2-1.

On several occasions the City Council of the City of Chicago has exercised its authority to establish employment policy with regard to City personnel. More particularly, the City Council has established the City's policy with regard to personnel decisions based on a employee's race or political affiliation.

One of the earliest expressions of City policy with regard to race discrimination in employment was the Fair Employment Practices Ordinance, ch. 198.7A of the Municipal Code of the City of Chicago. This ordinance, which was passed by the City Council on August 21, 1945, provided in relevant part:

It shall be unlawful for any department of the city of Chicago, or any city official, his agent or employee, for on or behalf of the city of Chicago, involving any public works of the city of Chicago to refuse to employ or to discharge any person, otherwise qualified, on account of race, color, creed, national origin, or ancestry; to discriminate for the same reasons in regard to tenure, terms or conditions of employment; to deny promotion or increase in compensation solely for these reasons....

\* \* \* \* \* \*

It shall be unlawful for any person to discriminate against any other person by reason of race, creed, color or national origin, with respect to the hiring, application for employment, tenure, terms or conditions of employment.

This ordinance was in effect on December 2, 1983, *i.e.* the date on which Superintendent Rice ordered the plaintiffs' demotions.[7]

On July 5, 1972 the City Council adopted an Employment Discrimination Resolution in which it was resolved:

That the Mayor of the City of Chicago and the City Council in meeting assembled this 5th day of July, 1972, do hereby affirm that it is the policy of the City of Chicago that all departments, commissions, and committees, hire, promote and afford equal treatment to all citizens regardless of race, creed, color, religion, age, sex, physical or mental handicaps, or national origin.

Under Illinois law, a resolution is "a formal expression of the opinion or will of a public assembly adopted by a vote." *DeLeuw, Cather & Co. v. City of Joliet,* 327 Ill.App. 453, 462, 64 N.E.2d 779 (1945). The court believes that the 1972 Employment Discrimination Resolution represents the City Council's exercise of its authority to establish employment policy for the City of Chicago. *See McConney v. City of Houston,* 863 F.2d 1180, 1184 (5th Cir.1989) (municipal policy can be established by means of "a policy statement, ordinance, regulation, or decision that is officially adopted or promulgated by the municipality's governing body ...").

Finally, and perhaps most importantly, effective January 1, 1976 the City Council enacted a personnel ordinance, thereby replacing the personnel scheme provided by Article 10, division 1, of the Illinois Municipal Code. *See* Chicago Municipal Code, ch. 25.1; *Dineen v. City of Chicago,* 125 Ill.2d 248, 260, 126 Ill.Dec. 52, 531 N.E.2d 347 (1988). As noted by the Illinois Supreme Court in *Dineen,* the stated purpose of the City Council in establishing the personnel ordinance was:

"... to establish a system of personnel administration that meets the social, economic, and program needs of the people of the City of Chicago, to provide for a

---

7. The City has represented that the Fair Employment Practices Ordinance was repealed on December 21, 1988 and was replaced by the new Human Rights Ordinance passed by the City Council on the same date, to be effective February 17, 1989. (*See* City's Memorandum in Response to Minute Order of March 8, 1989, p. 3.)

professional and progressive merit system for employment, and to insure flexible career service within the City of Chicago by substituting a public employment system superseding the Civil Service System now operating within the City of Chicago pursuant to the law of the State of Illinois."

*Dineen*, 125 Ill.2d at 260, 126 Ill.Dec. 52, 531 N.E.2d 347 (quoting Chicago Municipal Code § 25.1-1 (1976)). When the 1976 personnel ordinance was revised in 1981, the new introductory paragraph contained nearly identical language to that of the old. Only the by-then unnecessary reference to the "Civil Service System" was deleted. *Dineen, supra,* 125 Ill.2d at 261, 126 Ill. Dec. 52, 531 N.E.2d 347.[8]

In relevant part, the personnel ordinance provides:

25.1-8. No person shall discriminate against any employee or applicant for employment because of race, creed, color, sex or national origin.

25.1-9. A. No person shall directly or indirectly coerce, attempt to coerce or command any employee in the city service to pay, lend or contribute anything of value to a party, committee, organization, agency, or person for political purposes.... Nothing herein contained shall affect the right of the employee to hold membership in, and support, a political party, to vote as he chooses, to express his opinions on all political subjects and candidates, to maintain political neutrality, and to attend political meetings.

Sections 25.1-8 and 25.1-9 of the personnel ordinance appear to be irrefutable manifestations of the City Council's authority to establish employment policy, and in particular employment policy regarding discrimination based upon either race or political affiliation.[9]

As this court pointed out to the parties approximately a year ago, however, section 25.1-13 of the personnel code muddles the simplicity of this conclusion. Section 25.1-13 provides, again in relevant part, that the personnel ordinance does not "have any effect upon the selection, powers or duties of the Superintendent of Police as set forth in the Municipal Code of the City of Chicago and Section 3-7-3.2 of the Illinois Municipal Code." The court raised the issue of whether, by means of section 25.1-13, the City Council expressed an intention to "exempt the Superintendent of Police from the City's policy that no person shall discriminate against any employee or applicant for employment because of race, creed, color, sex or national origin." (*See* Transcript of Proceedings, 3/6/89, p. 58.)

---

8. In *Dineen, supra,* the Illinois Supreme Court in dicta noted that "[l]ike the 1976 personnel ordinance, the 1981 ordinance applied to all employees in the city service, including police officers, except officers above the rank of captain." 125 Ill.2d at 261. As support for this statement, the Court cited § 25.1-3 of the Chicago Municipal Code.

Except as discussed *infra*, this court has been unable to find any language in § 25.1-3, or any other provision, that would indicate that police personnel above the rank of captain are exempt from the policy provisions of the personnel ordinance. In fact, even the power of the Superintendent of Police to appoint, promote, suspend or transfer employees of the Police Department (except for the secretary of the Police Board) is specifically made subject to the "civil service provisions," *i.e.* the personnel code. Chicago Municipal Code, § 11-6. This court, accordingly, has interpreted *Dineen*'s language regarding the application of the ordinance to refer to those provisions of the personnel ordinance establishing rules and procedures for career service employees.

9. The City also argues that the consent decrees entered into by the City in *Shakman v. Democratic Organization of Cook County,* 481 F.Supp. 1315, 1356–1359 (N.D.Ill.1979) and *Alliance to End Repression v. City of Chicago,* 561 F.Supp. 537, 559–74 (N.D.Ill.1982) represent municipal policy with regard to employment decisions based upon a person's exercise of his or her First Amendment rights. By means of the consent decree entered into in *Shakman,* the City (through the Corporation Counsel of the City of Chicago) agreed to be permanently enjoined from conditioning or basing any aspect of governmental employment upon a political reason or factor. In *Alliance to End Repression* the City agreed not to "disrupt, interfere with or harass any *person* because of the person's *First Amendment conduct.*" 561 F.Supp. at 562 (emphasis in original). The court agrees that these consent decrees represent a "decision to adopt [a] particular course of action ... made by [the City's] authorized decisionmakers," and thus represent official municipal policy with regard to political discrimination. *Pembaur,* 106 S.Ct. at 1299.

The plaintiffs' position, as might be expected, was (and remains) that the City Council has delegated to the Superintendent of Police unfettered authority to set employment policy for the police force. (*See* id., p. 63.)[10] The City, by contrast, argued (and continues to argue) that read as a whole, the Municipal Code makes clear that the Chicago City Council neither exempted the Superintendent of Police from the broad policy provisions of the personnel ordinance nor delegated to the Superintendent the authority to establish, even within the Chicago police force, employment policy with regard to discrimination on the basis of race or political affiliation.

The court has concluded that since the enumerated powers and duties of the Superintendent of Police do not include the power or duty to establish employment policy—and particularly employment policy with regard to discrimination on the basis of racial or political animus—the language of § 25.1–13 has no effect upon the Superintendent's obligation to abide by the policy provisions of the personnel ordinance.

The statutory sources of the Police Superintendent's powers and duties nowhere include the authority to establish employment policy. Ill.Rev.Stat. ch. 24, ¶ 3–7–3.2 (incorporated by reference into the Municipal Code of Chicago, § 25.1–13) states that the Superintendent of Police "shall be the chief executive officer of the police department...." He is responsible for:

the general management and control of the police department and shall have full and complete authority to administer the department in a manner consistent with the ordinances of the city, the laws of the state, and the rules and regulations of the police board.

Similarly, the Chicago Municipal Code provides that the Superintendent of Police, as "chief executive officer of the police department," shall "have complete authority to administer the department in a manner consistent with the ordinance of the city, the laws of the state, and the rules and

regulations of the police board." (Municipal Code of Chicago, § 11–5.) By legislative enactment the Superintendent of Police has the power and duty:

(1) to administer the affairs of the department as its chief administrative officer; (2) to organize the department with the approval of the [Police] Board; (3) to make appointments, promotions, transfers of and to take disciplinary action against employees of the department other than the secretary of the Board; (4) to appoint, discharge, suspend or transfer the employees of the department ...; [and] (5) to expend the funds of the department....

(Municipal Code of Chicago, § 11–6.)

The court has been unable to find any language within these provisions of the Municipal Code to indicate that the Chicago City Council entrusted the Superintendent with final policymaking authority for making municipal employment policy. Just as the Eighth Circuit concluded on remand in *Praprotnik*, this court concludes that "[a]t most, [the Superintendent was] entrusted with the authority for making discretionary personnel decisions in [his own] department." *Praprotnik*, 879 F.2d at 1575. The court believes, moreover, that the City Council certainly never vested the Superintendent of Police with the power to set employment policy for the City's police department which is contrary to the City Council's own policy statements regarding the use of race or political affiliation as a basis for an employment decision. These policy statements of the City are to be found in the Fair Employment Practices Ordinance of 1945, the Employment Discrimination Resolution of 1972, the consent decrees entered into by the City in *Shakman* and *Alliance to End Repression, supra,* and finally, the policy provisions of the Chicago personnel code.

In sum, the court concludes that the City cannot be held liable for the alleged actions of Police Superintendent Rice under the

---

**10.** *Cf. Praprotnik, supra,* 108 S.Ct. at 924: "'Authority to make municipal policy may be granted directly by a legislative enactment or may be delegated by an official who possessed such authority, and of course, whether such official had .final policymaking authority is a question of state law,'" *quoting Pembaur, supra,* 106 S.Ct. at 1300.

theory that Mr. Rice was a final policymaker. Although the Superintendent of Police is indeed a powerful position within the municipal hierarchy, the City Council has reserved to itself the power to set employment policy. The City Council, in fact, has issued various statements and entered into various agreements regarding the policy of the City of Chicago with regard to the role race and political affiliation should play in personnel decisions. Superintendent Rice had no authority either to create or to alter such policies.

B. Widespread Practice Constituting Custom or Usage Having the Force of Law.

■ As an alternative basis for recovery, plaintiffs argue that they "will establish that notwithstanding [the] *Shakman* Decree or any other policy constraining the superintendent's exercise of his authority the actual policy differs from stated policy." (Plaintiffs' Supplemental Memorandum Relating to "Municipal Policy," p. 4.) Longstanding custom or " 'entrenched practice' " continues to be a basis for the imposition of municipal liability under § 1983. *Sims v. Mulcahy*, 902 F.2d 524 (7th Cir.1990), *quoting Gray v. Dane County*, 854 F.2d 179, 183 (7th Cir.1988); *see also Praprotnik, supra*, 108 S.Ct. at 925–26.

Frankly, the court has had a difficult time determining the exact custom or practice challenged by the plaintiffs. As noted above (*see* n. 4), the Second Amended Complaint alleges:

It has been the longstanding custom and policy of the Police Department and of each successive Police Superintendent since Orlando Wilson for persons in the plaintiffs' job categories to be hired, fired, promoted, demoted, or transferred solely on the basis of merit. In particular it has been the longstanding custom

and policy to fire or demote persons in such categories only when there is cause to do so.

(Second Amended Complaint, Count I, ¶ 45, incorporated by reference in ¶ 2 of Counts II, III, IV and V.) [11] Plaintiffs find themselves in the awkward position of trying to refute their own allegation that at least the effect of the long-standing custom and policy of the City has been exactly what they would have it be.

In an attempt to do so, plaintiffs have articulated the following custom or practice as being at issue:

[W]hen there is a new Police Superintendent, all police officers in exempt ranked positions tender, or are requested (and expected) to tender their resignations, to allow the new Superintendent a free hand to choose his own senior staff, and further, that all of the officers in the exempt ranked position are subject to removal and reassignment to their former career level service positions with or without cause wholly at the unfettered discretion of the Superintendent.

(Plaintiffs' Opposition to the City of Chicago's Motion for Summary Judgment for Dismissal of Plaintiffs' Claims Against It Because of an Absence of a City Policy ... ["Opposition Mem."], pp. 2–3.) Plaintiffs have stated that "[t]his is the policy, custom and practice underlying plaintiffs' claims." (Opposition Mem., p. 3, n. 2.)

For purposes of determining this summary judgment motion, the court will assume that plaintiffs have made an adequate showing that there exists a custom or practice of requiring the exempt rank officers of the Chicago police department to offer their resignations upon the appointment of a new Superintendent of Police.

Plaintiffs' complaint about the alleged custom appears to be that the City failed to establish appropriate procedures to ensure

---

**11.** *See also* transcript of the deposition of Patrick McDanough, a plaintiff in this action, pp. 65–66:

The custom in the exempt ranks, to the best of my knowledge, which I will confine to the Brzeczek administration, is that if you went into the exempt ranks the only reason that

you would not either stay laterally—stay in the position you were in, or be moved laterally, or be moved up was for just cause. It wouldn't be done arbitrarily and capriciously, it wouldn't be done because of race, it wouldn't be done because of—to pay off political debts....

474

that the Police Superintendent's authority was not exercised arbitrarily. The "unfettered discretion" permitted the Police Superintendent, plaintiffs contend, "facilitated and allowed officers to be excluded because of the constitutionally protected political activities they had engaged in or because of their race." (Opposition Mem., pp. 7–8.) The court has interpreted plaintiffs' claim, therefore, as one challenging municipal inaction. *See, e.g., Thomas v. City of Zion,* 665 F.Supp. 642, 645 (N.D.Ill. 1987) (noting that certain instances of municipal inaction may result in *Monell* liability, even though the inaction alone is not unconstitutional).

Although a municipality's failure to implement procedures, rules or regulations may be actionable under § 1983, a plaintiff seeking to establish such a claim "must show that there is an 'extremely high degree' of municipal culpability." *Jones v. City of Chicago,* 787 F.2d 200, 205 (7th Cir.1986); *see also Sims v. Mulcahy, supra,* 902 F.2d at 543 (extensively reviewing *Jones* analysis with regard to evidence necessary to establish municipal liability on the basis of alleged inaction). In a holding directly applicable to this case, the Seventh Circuit stated:

> Where the custom itself does not establish wrongdoing, there must be evidence of a course of events or circumstances that permit an inference of deliberate indifference or tacit authorization of the offensive acts.

*Jones, supra.* In other words, the plaintiff " 'must show the municipality was aware either of actual deprivations or of such a strong likelihood of imminent (though unrealized) deprivations that any reasonable person would have taken preventative measures.' " *Id.,* quoting with approval from the district court's opinion, 608 F.Supp. 994, 1000 (N.D.Ill.1985). To defeat the City's summary judgment motion, plaintiffs were required "to show that they would produce 'specific facts' at trial which could establish a deliberate indifference to their constitutional rights or tacit authorization of the employee misconduct." *Jones,* 787 F.2d at 205.

Plaintiffs have made no such showing here. Plaintiffs have argued several "reasons" why they believe it is "fair to conclude that the City of Chicago is liable for Superintendent Rice's alleged violation of their civil and constitutional rights." (Opposition Mem., p. 8.) First, plaintiffs point to the long established authority of the Superintendent to appoint and remove the exempt rank officers without fear of administrative review of his decisions. Next, plaintiffs argue that:

> ... Superintendent Rice's actions were taken after a highly politically and racially divisive primary campaign between the incumbent Mayor Jane Byrne and Harold Washington. Mayor Washington during the primary had made the exclusion of minorities from senior city positions a major issue and had promised to change the racial composition of senior management in municipal agencies, including, if not especially, the Police Department.

(Opposition Mem., p. 7.) Plaintiffs also argue that "Superintendent Rice has admitted that he sought and obtained Mayor Washington's approval of the changes he made...." (Id.) And finally, plaintiffs contend:

> Given the political, racial history of the City, it is likely that such authority was exercised unlawfully in the past. Indeed Mayor Washington had campaigned in part on the complaint that blacks had been unlawfully excluded from such positions.

(Id. at p. 8, n. 9.)

The court finds these "reasons" insufficient to raise a genuine issue of material fact with regard to whether the City was deliberately indifferent to plaintiffs' constitutional rights or tacitly authorized the alleged unconstitutional acts of Superintendent Rice. Plaintiffs would have this court find that a genuine issue of material fact exists based solely on conjecture about "the racial history of the City" or the effect on municipal lawmakers of a racially divisive mayoral campaign. Even viewing this evidence—to the extent that it can be so labelled—in the light most favorable to

the plaintiffs, the court concludes that it does not give rise to an inference of municipal culpability under § 1983.[12]

## II. *Count V: Retaliation for Filing Federal Lawsuit.*

■ The court has hesitated to separate its discussion of municipal liability under Count V from the discussion of Counts II and III since plaintiffs have rarely, in the course of briefing the City's motion for summary judgment, differentiated between the policy and custom at issue in Count V and that at issue in Counts II and III. In fact, plaintiffs have strongly implied that the policy explained above, *i.e.* the policy of allowing the Police Superintendent unfettered discretion to reassign exempt ranked officers, underlies all of its claims. (*See* Opposition Mem., p. 3, n. 2; *see also* Plaintiffs' Opposition to the City of Chicago's Motion for Summary Judgment For Dismissal of Plaintiffs' Claims Against It, pp. 6–7, failing to differentiate between the policies and customs alleged in the separate counts of the Second Amended Complaint.)

Plaintiffs' Second Amended Complaint, however, clearly puts at issue a different policy from that asserted by the plaintiffs to be at issue in Counts II and III. Count V alleges that it is the custom and policy of the City to harass and retaliate against police officers who have filed federal lawsuits. (Second Amended Complaint, Count V, ¶ 73.) Accordingly, the court has concluded that Count V merits a separate (but brief) discussion.

The City has moved for summary judgment on Count V on the ground that municipal policy, as provided by the Agreed Order, Judgment and Decree entered into by the City in *Alliance to End Repression v. City of Chicago,* 561 F.Supp. 537 (N.D.Ill. 1982), prohibits retaliatory treatment on the basis of protected First Amendment conduct. (Supplemental Memorandum in Support of City's Motion for Summary Judgment, p. 2.) The Agreed Order, Judgment and Decree entered into by the City in *Alliance to End Repression* specifically states that it is the policy of the City of Chicago that:

> No person shall be prejudiced in dealings with government because of, nor disrupted in the exercise of, the person's political beliefs, associations or other First Amendment conduct.

561 F.Supp. at 560.[13]

For the reasons stated earlier in section I.A. of this Memorandum Opinion and Order, the court concludes that the Superintendent of Police does not possess final policymaking authority with regard to the treatment to be accorded police officers who have filed lawsuits in federal court. The City has, by means of its consent to the Agreed Order, Judgment and Decree in *Alliance to End Repression,* exercised its authority to make policy on this issue. The policy of the City is that no one may take adverse treatment against a person because of that person's exercise of his or her First Amendment rights.

---

**12.** In *Jett, supra,* 109 S.Ct. at 2721, the Court concluded that "the express cause of action for damages created by § 1983 constitutes the exclusive federal remedy for violation of the rights guaranteed in § 1981 by state governmental units...." Accordingly, to the extent Count III purports to state a separate ground for relief under § 1981, it must be dismissed.

Moreover, the Supreme Court's decision in *Patterson v. McLean Credit Union,* —— U.S. ——, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989) raises grave doubts as to whether § 1981 protection reaches the claims presented by plaintiffs in Count III. As the Seventh Circuit has explained, the *Patterson* ruling signifies that "[p]ostformation conduct by an employer relating to the terms and conditions of continuing employment is not actionable under § 1981." *Lynch v. Bel-*

den & Co., Inc.,* 882 F.2d 262, 266 (7th Cir.1989), cert. denied —— U.S. ——, 110 S.Ct. 1134, 107 L.Ed.2d 1040 (1990). See also McKnight v. General Motors Corp.,* 908 F.2d 104 (7th Cir.1990) (transfer between divisions of a company does not automatically create a new employment relationship sufficient to invoke § 1981 protection). Cf. Jett, supra,* 109 S.Ct. at 2709–10.

**13.** The court notes that the Agreed Order, Judgment and Decree stated, as a matter of principle, that the First Amendment protected the right "to associate for the advancement of litigation." 561 F.Supp. at 560. Of course the Seventh Circuit has determined that the plaintiffs' filing of this lawsuit constituted conduct protected by the First Amendment. *Auriemma, supra,* 910 F.2d at 1460.

Furthermore, plaintiffs have failed—in response to the City's motion—to come forward with any evidence that despite the City's stated policy, there has existed a deeply entrenched custom and practice of retaliating against police officers who file federal lawsuits challenging some aspect of their employment. "The word 'custom,'" the Seventh Circuit has explained, "generally implies a habitual practice or course of action that characteristically is repeated under like circumstances." *Jones, supra,* 787 F.2d at 204. In the absence of a showing that a municipal policy was authorized by a final policymaker, the City cannot be held liable for an isolated incident of unconstitutional misconduct. *See Ross v. United States,* 910 F.2d 1422, 1429–30 (7th Cir. 1990); *see also Strauss v. City of Chicago,* 760 F.2d 765, 767 (7th Cir.1985).

As stated above, speculation about the political and racial history of the City is no substitute for the evidentiary showing required as a response to a motion for summary judgment. *See Sims v. Mulcahy, supra,* 902 F.2d at 539–540 (noting that complete failure of proof concerning an essential element of a non-moving party's case entitles movant to summary judgment). In order to withstand the City's motion for summary judgment, plaintiffs were required to present some factual foundation for their claim that despite the *Alliance* decree, police officers—other than themselves—have filed lawsuits challenging the conditions of their employment and have thereafter been subjected to harassment by police personnel. Although some of the plaintiffs have presented evidence regarding the treatment they have received as a result of the filing of the complaint in *this* suit (*see* Memorandum Opinion and Order dated 2/27/87, pp. 8–11), such evidence alone fails to raise a genuine issue of material fact regarding an entrenched "'pattern or a series of incidents of unconstitutional conduct....'" *Gray v. Dane County,* 854 F.2d 179, 183 (7th Cir.1988),

*quoting Powe v. City of Chicago,* 664 F.2d 639, 650 (7th Cir.1981). Accordingly, the City's motion for summary judgment on Count V must be granted.

### III. *Count IV: Civil Rights Conspiracy.*

■ Only the City's motion with regard to Count IV, the conspiracy claim, remains for resolution. Section 1985(3) has been held to apply to conspiracies to discriminate against persons on the basis of political loyalty, *Volk v. Coler,* 845 F.2d 1422, 1434 (7th Cir.1988) and, more recently, to conspiracies motivated by a racial animus towards whites. *Triad Associates, Inc. v. Chicago Housing Authority,* 892 F.2d 583, 591–93 (7th Cir.1989), *reh'g denied* 1989 WL 154822, 1990 U.S.App. LEXIS 3375 (1990).[14]

Nevertheless, because plaintiffs have been unable to demonstrate that a genuine issue of material fact exists with regard to the existence of a municipal policy or custom having some affirmative link to the alleged constitutional deprivations, summary judgment must be entered in favor of the City on the conspiracy claim. *Cf. O'Connor v. City of Chicago,* No. 87 C 10945 (N.D.Ill. Feb. 21, 1989) (1989 WL 15976, 1989 U.S.Dist. LEXIS 1726, p. 8: "In order to sustain a claim of conspiracy [against the City of Chicago] under § 1985(3), plaintiff must allege the existence of a municipal policy or custom causative of his alleged constitutional deprivation"); *Eiland v. Hardesty,* 564 F.Supp. 930, 934 (N.D.Ill.1982) ("To state a claim against a city under § 1985 the complaint must allege an official policy or custom which relates to matters stemming from or resulting in the conspiracy"). At the summary judgment stage, plaintiffs were required to submit some evidence showing a genuine issue of material fact as to the existence of such a policy or custom. As

---

**14.** To the extent that Count IV seeks to assert a conspiracy between the City and Mr. Rice in his official capacity, the claim is precluded by the intra-corporate conspiracy doctrine of § 1985(3). *Dombrowski v. Dowling,* 459 F.2d 190, 196 (7th Cir.1972). *See Maloney v. Wash-*

*ington,* Nos. 84 C 689, 85 C 1905 (N.D.Ill. Dec. 1, 1987) (1987 WL 26146, 1987 U.S.Dist. LEXIS 11142, p. 5: "A municipality cannot be charged with conspiracy with its officials acting in their official capacities, else the municipality would be charged with conspiring with itself").

477

explained above, they have failed to satisfy this requirement.

CONCLUSION

For the reasons stated herein, the City's motion for summary judgment on Counts II, III, IV and V of the Second Amended Complaint is GRANTED. There being no just reason for delay, judgment in favor of the defendant City of Chicago shall be entered. All other motions filed by the City are moot.