**John AURIEMMA, et al., Plaintiffs–Appellants,**

v.

**Fred RICE, Defendant,**

and

**City of Chicago, Defendant–Appellee.**

No. 90–3142.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 10, 1991.

Decided Feb. 28, 1992.

See also, 910 F.2d 1449.

Mark L. LeFevour (argued), Callahan, Fitzpatrick, Lakoma & McGlynn, Oak Brook, Ill., John L. Gubbins, Gubbins & Associates, Chicago, Ill., for plaintiffs-appellants.

Jean Dobrer, Asst. Corp. Counsel (argued), Matthew J. Piers, Gessler, Flynn, Fleischmann, Hughes & Socol, Phillip H. Snelling, Asst. Corp. Counsel, Lawrence Rosenthal, Deputy Corp. Counsel, Henry F. Field, James D. Montgomery, Montgomery & Associates, Earl L. Neal, Langdon D. Neal, Shelli D. Williams, Neal & Associates, Chicago, Ill., D. Rainell Rains, Skokie, Ill., Kelly R. Welsh, Asst. Corp. Counsel, Appeals Div., Chicago, Ill., for defendant-appellee.

Before EASTERBROOK, RIPPLE and MANION, Circuit Judges.

EASTERBROOK, Circuit Judge.

After becoming Superintendent of Police in Chicago, Fred Rice reshuffled the senior ranks of the Department. Thirteen black officers were promoted and no black officers were demoted; nine white officers were promoted and twenty-five demoted; three Hispanic officers were promoted and one demoted; six positions were abolished. Rice offered no reason at the time (December 1983) other than that he felt more "comfortable" with the newly promoted officers, and none since other than that he wanted executives who "accepted his management style." Eighteen of the demoted officers filed this suit under 42 U.S.C. § 1983, contending that Rice and the City of Chicago held their race and politics against them in violation of the Constitution.

The claims against Rice have become separated from those against the City. The district judge held that Rice is not entitled to immunity. Proceedings against the City were stayed while Rice's appeal was considered by a panel and then by the court sitting in banc. We held that Rice is entitled to immunity against some but not

all claims. *Auriemma v. Rice*, 910 F.2d 1449 (7th Cir.1990) (in banc), cert. denied, —— U.S. ——, 111 S.Ct. 2796, 115 L.Ed.2d 970 (1991). While the Supreme Court was considering Rice's request for review, the district judge took up the officers' claims against the City, which does not possess immunity. The City prevailed across the board. 747 F.Supp. 465 (N.D.Ill. 1990). Municipalities are answerable only for their own decisions and policies; they are not vicariously liable for the constitutional torts of their agents. *Monell v. New York Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). The district judge's conclusion that Rice implemented no "policy" other than his own ensured victory for the City. The district court entered judgment in the City's favor under Fed.R.Civ.P. 54(b), and the officers have appealed.

We must decide what it means to be a municipal "policymaker" under *Monell* and cases in its line, especially *Jett v. Dallas*, 491 U.S. 701, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989), *St. Louis v. Praprotnik*, 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988), and *Pembaur v. Cincinnati*, 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). There are two polar approaches, each with some support in these cases. One equates "policy" with the legislative power of a jurisdiction. The holder of the ultimate power to establish rules of general applicability is the "policymaker." Usually this means the city council; at all events, holders of purely executive power are never "policymakers." The opposing approach equates "policy" with the ability to take final action in the name of the jurisdiction—that is, the executive power. A person authorized to commit the city to a course of action necessarily sets its policy; on this view, the action *is* the policy.

 There are of course intermediate possibilities. State and local governments need not follow the pattern of separated powers in the national Constitution. *Risser v. Thompson*, 930 F.2d 549, 551–52 (7th Cir.1991); *Chicago Observer, Inc. v. Chicago*, 929 F.2d 325, 328 (7th Cir.1991). Executive officials sometimes exercise legisla-

tive powers (think of the city manager model, related to parliamentary government). Purely executive officials may have the power to set policy by delegation (express or implied by custom) when the legislature is silent. See *Jones v. Chicago*, 787 F.2d 200, 204 (7th Cir.1986); *Strauss v. Chicago*, 760 F.2d 765, 770 (7th Cir.1985). Even executive action in the teeth of municipal law could be called policy. It would not twist the language to say that for a long time Chicago's policy was to use public employment to reward political friends and punish political enemies, even though state and local law required merit selection for many positions. A practice undertaken by the executive power and suffered by the legislative power may be said to reflect a custom with the force of legislation.

 Fortunately we need not contemplate the proper treatment of these middle cases. Ordinances applicable to the police department unequivocally ban racial and political discrimination. Municipal Code of Chicago §§ 25.1–8, 25.1–9 (effective 1976–1988). See *Resman v. Personnel Board*, 96 Ill.App.3d 919, 922, 52 Ill.Dec. 439, 441, 422 N.E.2d 120, 122 (1st Dist.1981) (municipal personnel code applies to police department). Since 1972 Chicago has been under an injunction requiring the elimination of political considerations for most positions (including the ones plaintiffs held). See *Shakman v. Democratic Organization of Cook County*, 481 F.Supp. 1315, 1356–59 (N.D.Ill.1979) (reprinting text of 1972 consent decree). Plaintiffs do not contend that the City Council condoned departures from these rules. Quite the contrary, plaintiffs alleged that the norm for the senior ranks of police has been merit selection. They seek to use this benchmark to show that the decisions in December 1983 must have been based on politics or race. "If not merit, what?" has been the plaintiffs' battle cry. Yet this strategy excludes pinning their demotions on a legislative decision of the City, or on the legislature's acquiescence in a pattern of decisions by the executive. On the plaintiffs' own theory, the buck stops with Fred Rice. (The complaint alleges that Rice cleared his decisions with Harold Washington, then the

mayor, but this is immaterial; the mayor is an executive, not legislative, official in Chicago's system of government.) Unless an entirely executive decision establishes municipal policy because it is final, the plaintiffs must lose.

To state the issue in this way is to imply the answer. For what can it mean to say "no vicarious liability" unless there is a distinction between creation and implementation of rules? Any city acts exclusively through agents; the city is just a name for a complex of persons. If it were enough to point to the agent whose act was the final one in a particular case, we would have vicarious liability. Action in the course of one's duty is the basis of vicarious liability. That a particular agent is the apex of a bureaucracy makes the decision "final" but does not forge a link between "finality" and "policy". The President, a cabinet officer, or his delegate makes the final decision in the implementation of the laws without changing the fact that the President executes rather than makes law. One may doubt the footing of *Monell*, see Larry Kramer & Alan O. Sykes, *Municipal Liability Under § 1983: A Legal and Economic Analysis*, 1987 Sup.Ct.Rev. 249; Peter H. Schuck, *Municipal Liability Under Section 1983: Some Lessons from Tort Law and Organization Theory*, 77 Geo. L.J. 1753 (1989), but that decision is not to be sabotaged by calling the chief bureaucrat who signs off on a particular action the city's "policymaker" for that action.

■ "Policy" has a normative as well as a positive dimension. That an agent of the municipality did something tells us the positive side, the "is" of public action; to discern the city's policy we also need to know the "ought" of its action. Unless today's decision ought to govern tomorrow's case under a law or a custom with the force of law, it cannot be said to carry out the municipality's policy. Even an act in the teeth of the government's rules may be state action, see *Home Telephone & Telegraph Co. v. Los Angeles,* 227 U.S. 278, 287–89, 33 S.Ct. 312, 314–15, 57 L.Ed. 510 (1913). See also *Ex parte Virginia,* 100 U.S. 339, 346–47, 25 L.Ed. 676 (1880).

Liability for unauthorized acts is personal; to hold the municipality liable, *Monell* tells us, the agent's action must implement rather than frustrate the government's policy.

Decisions of the other courts of appeals on this subject are so varying that there is little point in canvassing them. A series of fractured opinions from the Supreme Court gave comfort to almost every position. The period of many voices may be coming to a close. A majority of the Court in *Jett,* 491 U.S. at 736–38, 109 S.Ct. at 2722–24, adopted Justice O'Connor's plurality opinion in *Praprotnik* as the governing standard. Justice O'Connor concluded in *Praprotnik* that the identity of a government's policymaker is a question of local law, 485 U.S. at 123–25, 108 S.Ct. at 923–25, and she was confident that state or local law "will always direct a court to some official or body that has the responsibility for making law or setting policy in any given area of a local government's business." *Id.* at 125, 108 S.Ct. at 924. Unfortunately these expressions do not tell us whether we turn to local law in a search for ultimate legislative or executive power. Nothing in her opinion is explicit on the subject, but the answer is implicit in the holding of the case as well as in a footnote, 485 U.S. at 124 n. 1, 108 S.Ct. at 924 n. 1, rejecting the possibility that the policymaker may be identified by determining who wields final authority in the city's "actual power structure."

*Praprotnik,* like our case, arose out of a transfer that amounted to a demotion within a bureaucracy. The Director of the Community Development Agency of St. Louis shuffled Praprotnik to a less desirable job. The city's civil service commission declined to review the transfer because it did not entail a loss of pay or grade. Praprotnik sued under § 1983. He won in the court of appeals, which held that the Director of the Community Development Agency, who wielded final authority over Praprotnik's transfer, was the municipal policymaker. The Supreme Court disagreed, noting that the city charter authorized the civil service commission to review and set policy on personnel matters. 485 U.S. at 129–30, 108 S.Ct. at 927 (opinion of O'Connor, J.). Leaving the final decision

to the Director did not make him a "policymaker," the Court held, but "is equally consistent with a presumption that the subordinates are faithfully attempting to comply with the policies that are supposed to guide them." *Id.* at 130, 108 S.Ct. at 927.

■ Auriemma and the other plaintiffs maintain that *Praprotnik* does not govern because the civil service commission in St. Louis was at least nominally the end of the chain and reviewed many personnel decisions, albeit not all. Thus *Praprotnik* does not exclude the possibility that the Court would treat the tippy-top executive official as a "policymaker." Neither does *Praprotnik* embrace or give comfort to that position. For the reasons we have given, *Monell*'s effort to limit municipal liability under § 1983 to acts that carry out local policy entails distinguishing legislative from executive functions—a distinction always present in principle even though blurry in practice. "[R]esponsibility for making law or setting policy"—the objective under *Praprotnik* of our search through local law—is authority to adopt rules for the conduct of government. Authority to make a final decision need not imply authority to establish rules. In Chicago it does not. The Superintendent of Police in Chicago had no power to countermand the statutes regulating the operation of the department. The chief has "complete authority to administer the department in a manner consistent with the ordinances of the city, the laws of the state, and the rules and regulations of the police board." Municipal Code § 11–5 (1988; renumbered in 1990 edition as § 2–84–040). If "faults systemic in nature" can amount to local policy, see *Sims v. Mulcahy,* 902 F.2d 524, 543 (7th Cir.1990) (quoting from *Strauss* and *Jones*), plaintiffs' own complaint defeats their claim by alleging that Rice departed from a practice of merit selection. If, in the course of selecting senior staff, Rice discriminated on account of race and politics, he violated rather than implemented the policy of Chicago. On Rice falls the responsibility for his deeds.

AFFIRMED.

RIPPLE, Circuit Judge, concurring.

I concur in the judgment of the court. The complexities of civil rights litigation quite naturally produce a yearning for a concise definition or a bright-line rule with respect to the identity of a municipal policymaker. Today, however, local governmental structures take many shapes, and the demands of contemporary municipal governance probably will expand rather than contract the possibilities in the foreseeable future. Consequently, the guidelines set forth by the Supreme Court in *Jett v. Dallas Independent School District,* 491 U.S. 701, 737, 109 S.Ct. 2702, 2723, 105 L.Ed.2d 598 (1989), are as precise as we have a right to expect at this point in the country's development. We must regard the matter as one of state law and review "the relevant legal materials, including state and local positive law, *as well as* ' "custom or usage" having the force of law.' " *Id.* (quoting *St. Louis v. Praprotnik,* 485 U.S. 112, 124 n. 1, 108 S.Ct. 915, 924 n. 1, 99 L.Ed.2d 107 (1988)) (emphasis added). We are told *how* to identify the policymaker. Beyond that, the matter must necessarily be handled in case by case adjudication.

The court's estimation of the situation before us is no doubt correct. Mr. Rice's actions cannot be characterized as the policy of the City of Chicago. His authority was to administer the department in accordance with state law and municipal ordinances. Under the facts of this case, he can claim no other source of authority and we need not speculate as to whether, on other facts, a custom or usage *having the force of law* might make him, under the guidance of *Jett,* a policymaker.