**Beverly A. HERRING, Plaintiff,**

v.

**CHICAGO HOUSING AUTHORITY, et al., Defendants.**

No. 90–C–3797.

United States District Court, N.D. Illinois, E.D.

April 7, 1994.

Gary H. Palm, Randall D. Schmidt, Catherine Cardwell MacCarthy, Marc Stahl, Mandel Legal Aid Clinic, Chicago, IL, for plaintiff.

James J. Casey, Michael James Mueller, Catherine A.T. Nelson, Keck, Mahin & Cate, F. Willis Caruso, City of Chicago Housing Authority, Labor Dept., Chicago, IL, for defendants.

## *MEMORANDUM OPINION AND ORDER*

NORDBERG, District Judge.

Plaintiff Beverly A. Herring, a resident of the Chicago Housing Authority's Harold Ickes Homes ("HIH"), has sued the Chicago Housing Authority ("CHA"), and several CHA officials in their official capacities: Vincent Lane, the Chairman of the CHA Board, Virginia Peoples, an Area Director of CHA for the area including HIH, Beverly Shepard, the CHA Site Manager of HIH, and Earnest Eddins, the Assistant Site Manager of HIH. Plaintiff alleged, in her Second Amended Complaint now before the Court, violations of her rights under the First Amendment, the Due Process Clause of the Fourteenth Amendment, the United States Housing Act, and her lease agreement with the CHA. The Plaintiff claims that the CHA has, or had, certain eviction policies regarding its tenant's rights of association. She claims that, as a result of these policies, Defendants attempt-ed to terminate her tenancy, in violation of several of her constitutional and statutory rights.

The parties filed cross-motions for summary judgment and, on May 28, 1992, the Court referred the motions to a Magistrate Judge for a Report and Recommendation. Now before the Court is that Report and Recommendation, dated April 22, 1993, in which the Magistrate Judge recommends that each motion be granted in part and denied in part. Each party has filed objections to the Report and Recommendation. Based on those objections, the Court reviews the Magistrate Judge's recommendations *de novo*. Fed.R.Civ.P. 72(b).

## I. BACKGROUND

The Magistrate Judge's Report and Recommendation sets out the factual background of this case in great detail. The Court summarizes the facts sufficient for this opinion below.

Ms. Herring lives on the twelfth floor of a fifteen story building located at 2822 South Calumet in Chicago, Illinois. Ms. Herring's apartment is one of several buildings in a development known as the Harold Ickes Homes ("HIH"). She lived at the same location during the events at issue in this lawsuit.

In early December 1988, the CHA conducted a "lockdown" of several of its apartment buildings, including HIH. CHA residents contested the legality of the "lockdown", filing a class action suit here in the Northern District of Illinois, *Summeries v. Chicago Housing Authority*, No. 88–C–10566 (N.D.Ill.). The district court eventually entered a Consent Decree resolving that litigation. The Consent Decree permitted the CHA to conduct inspections to identify and remove unauthorized occupants and to inspect the condition of the housing units, subject to the CHA's minimizing its intrusion on the rights of its residents. Pursuant to the Consent Decree, the CHA instituted a "Visitation Policy" at HIH. For a tenant to have a guest visit at a CHA apartment, the Visitation Policy required the tenant to write down in a registry the tenant's name, apartment number, and guest's name before the guest would be admitted to the building.

In addition to the class action filed against the CHA, several protest groups organized to protest the "lockdown." Two of these groups were the Campaign to End the CHA Lockdown (the "Campaign") and the Revolutionary Communist Party (the "RCP"). Ms. Herring was involved with, and attended, some, but not all of the organized protests. These groups and others staged protests of the lockdown. On May 1, 1990, one such protest became violent and resulted in the protestors barricading the doors to CHA management offices, throwing paint bombs, starting fires, damaging property, physically injuring CHA personnel, and taking rent payments from some residents. Among the more demonstrative acts of the protest was the placement of the head of a pig atop one of the HIH management buildings. Four protestors were arrested: Neil Danota, William K. Small, Cheryl Jue, and Sylvester Richmond (mistakenly called Richardson in a CHA memo), (see Defs.' Mot.Summ.J.App., Ex. F, Bates No. H000021). (Defs.' Resp. to Pl.'s Statement of Material Facts ¶ 23.)

Two days later, on the evening of May 3, 1990, Herring was in the lobby of her building waiting to register her fiancé pursuant to the Visitation Policy. While in the lobby, Herring encountered three individuals, now known to be Terry Jue who is also known as Cheryl Jue, Fred Johnson, and someone known only as "Ariel" (collectively, the "guests"). The guests were waiting to be admitted to see another tenant of the building, Sylvester Richmond, the same Sylvester Richmond who had been arrested on May 1. When Richmond did not come down to admit the guests, Herring signed them in. At the time, Herring did not know each of the individual guests' surnames. Instead of asking each guest his or her name, Herring made up names for each, writing down Terry Fong, Fred Clock, and James Clark.

Herring and the guests went to Richmond's apartment. A janitor recognized the guests as protestors and notified security. After looking for the guests at Herring's apartment, two security guards went to Richmond's apartment. There, the guards encountered the guests, requested them to leave the building, and escorted them out. The guards claim that they did not see Her-

ring or any other CHA tenant present in the apartment. Herring contends that she was in the kitchen of the apartment at the time the guards arrived. Apparently, the parties now agree that Herring was there.

On May 31, 1990, Herring received a notice informing her that her tenancy would terminate on June 21, 1990. However, she remained in her apartment through that date and on July 3, 1990 filed this lawsuit. After the filing of this case, the CHA filed, but eventually voluntarily dismissed without prejudice to reinstate, a state action seeking to evict Herring. During the pendency of the current litigation, Herring has remained in her CHA residence. The CHA has represented that it has no further intention to seek to evict Herring for the events of May 3, 1990. After refusing to accept rent from Herring for July and August of 1990, the CHA again accepted rent beginning in September 1990.

After extensive discovery and the filing of Plaintiff's Second Amended Complaint, the parties filed the instant cross-motions for summary judgment. The Magistrate Judge, in the Report and Recommendation, recommends that the Court grant Plaintiff's Motion as to her First Amendment claim and deny her Motion as to her remaining claims. The Magistrate Judge recommends that the Court deny the Defendants' Motion as to Plaintiff's First Amendment Claim but grant their Motion as to the remaining claims. The Court now turns to the parties' objections to these recommendations.

## II. ANALYSIS

### A. Plaintiff's Objections

The Magistrate Judge concluded that the Plaintiff's lease was never terminated and therefore recommended that the Court grant the Defendants' Motion for Summary Judgment on Plaintiff's Due Process, United States Housing Act, and lease claims, and deny Plaintiff's motion with regard to those claims. Plaintiff objects to these recommendations, arguing that her lease was terminated. The Court agrees with the Magistrate Judge.

It is undisputed that Plaintiff remains a resident of HIH, that she lives in the same

apartment she occupied during the events leading to this lawsuit, that she was never evicted, and that she did not lose any of her leasehold rights. And, Defendants have represented to the Court that they will not seek to evict Plaintiff based on the events leading to this lawsuit. In the opinion of the Court, the CHA notice of termination was invalid. As a result, the Court concludes that Plaintiff's lease was never terminated.

Plaintiff, however, argues that her lease terminated on June 21, 1990, twenty-one days after the service of the Notice of Termination. She contends that, since the notice of termination stated that her lease would end on June 21, 1990, it did end on that date. She also asserts that the Defendants' filing of a forcible entry and detainer action "conclusively demonstrates that a property deprivation occurred", i.e., that the lease was terminated. These arguments have no merit.

■■■ A notice of termination may end a lease when the landlord has the right to serve notice under the lease agreement or under statutory, administrative, or common law. However, a notice of termination does not automatically terminate the lease. *See Hoefler v. Erickson*, 331 Ill.App. 577, 73 N.E.2d 448, 451 (1947) (stating that a notice to terminate tenancy "does not in so many words terminate the tenancy").[1] If litigation is necessary, the landlord will usually file an action for forcible entry and detainer pursuant to the governing Illinois statutes. That action is intended to resolve the contested right to possession. One of the tenant's defenses in that action may be an asserted right to possession under the lease. If the tenant prevails in such an action, judgment finding the notice of termination invalid is entered in her favor. *See* 735 ILCS 5/9–114 (Smith–Hurd 1993). If so, she retains possession under the lease.

The Plaintiff contends that under Illinois law, a landlord cannot file a forcible entry and detainer action until after a tenancy has been terminated. This argument is flawed. Actually, a landlord cannot prevail on a forcible entry and detainer action until after the landlord proves its right to possession. In this case, such proof would have to demonstrate that Plaintiff's tenancy had been lawfully terminated.

Here, Plaintiff has successfully contested the CHA's right to terminate her tenancy. The CHA has represented to the Court that it no longer seeks to evict Herring. It cannot argue, in the future, that the lease should be terminated for the events of May, 1990. Herring has not been deprived of possession or the benefit of her lease for even a single day, she continues to be entitled to possession of her apartment under the lease, and the CHA has accepted rental payments from September 1990, waiving all rights under the notice to terminate the lease. Therefore, the Court concludes that the lease was not terminated. Accordingly, no deprivation has occurred and Plaintiff's Due Process, United States Housing Act, and lease claims must fail. Finding that there is no genuine issue of material fact and that Defendants are entitled to judgment as a matter of law, the Court grants Defendants' Motion for Summary Judgment on these claims. Plaintiff's Motion regarding these claims is denied.

### B. Defendants' Objections

In contrast with the recommendations favoring the Defendants on each of the above noted claims, the Magistrate Judge recommends that the Court grant Plaintiff's Motion for Summary Judgment on her First Amendment Claim. The Defendants contest several elements of that conclusion.

### 1. Introduction

Plaintiff's Second Amended Complaint asserts three grounds upon which the Plaintiff claims that her rights under the First Amendment were violated: (1) her lease was terminated, (Second Am.Compl. ¶ 25); (2) the lease, as interpreted by the CHA, is "vague, standardless, overboard," and grants unlimited discretion to defendants, (Second Am. Compl. ¶ 26); and, (3) her rights are violated by the Defendants' requirement that CHA tenants must inform CHA employees of the location where they and their guests are

---

1. The CHA notice of termination itself contemplates further action before the lease is legally terminated. The notice instructs the tenant not to make rent payments "while termination action is pending." (Defs.' Mot.Summ.J.App., Ex. H.)

going in the building. (Second Am.Compl. ¶ 27.)

Despite asserting three theories supporting their recovery under the First Amendment, Plaintiff focuses her authority and evidence on only one of the three, the termination of Plaintiff's lease. Plaintiff did not address either of the other two issues in any detail. Having conclusively ruled that Plaintiff's lease was not terminated, the Court denies Plaintiff's Motion based on that theory.

### 2. The Violation of Plaintiff's Right of Association

#### a. Introduction and Mootness

█ The Court's inquiry does not end there, however. Plaintiff has presented evidence to the effect that Defendants' conduct has chilled her expression of her associational rights under the First Amendment. Plaintiff avers that since receiving her Notice of Termination, she has had "practically no contact with associates" of the RCP or the Campaign. She did, however, attend one rally. She now avers that she has not participated in protest activities because she does not want to risk any adverse action by CHA. (Pl.'s Statement of Material Facts, Ex. V. ¶ 6.) Governmental conduct which does not constitute a direct prohibition of First Amendment rights may still violate the First Amendment by chilling the free exercise of those rights. *See Laird v. Tatum*, 408 U.S. 1, 11, 92 S.Ct. 2318, 2324, 33 L.Ed.2d 154 (1972). Although the parties have not addressed thoroughly this issue, this case might have been considered moot. However, given a Second Circuit decision holding that the threat of eviction, even if removed, is sufficiently proximate to create a case or controversy, Herring may be entitled to damages based on Defendants' conduct. *See Davis v. Village Park II Realty Co.*, 578 F.2d 461, 463 (2d Cir.1978) (reversing the decision of a district court to dismiss based on mootness despite the withdrawal of the defendants' eviction proceeding). Based on that case, the Court finds that the purported chilling effect here is neither so remote nor so speculative as to justify a finding that this lawsuit is moot. *See Spear v. Town of West Hartford*, 954 F.2d 63, 67–68 (2d Cir.1992) (distinguishing *Davis v. Village Park II Realty Co.*), *cert. denied*, —— U.S. ——, 113 S.Ct. 66, 121 L.Ed.2d 33 (1992). The Court thus turns to the merits of the case.

#### b. The Applicable Federal Regulation, the Notice of Termination, and the Visitation Policy

Under federal regulations applicable to this case, the CHA notice of termination must meet several requirements. The applicable regulation states:

> The landlord's determination to terminate the tenancy shall be in writing and shall: (1) State that the tenancy is terminated on a date specified therein; (2) state the reasons for the landlord's action with enough specificity so as to enable the tenant to prepare a defense; (3) advise the tenant that if he or she remains in the leased unit ·on the date specified for termination, the landlord may seek to enforce the termination only by bringing a judicial action, at which time the tenant may present a defense; and (4) be served on the tenant in the manner prescribed by paragraph (b) of this section.

24 C.F.R. § 247.4(a) (1990).

> Herring's notice of termination stated: CREATION OF A THREAT TO THE HEALTH AND SAFETY OF OTHERS. Leaseholder, Beverly Herring ... violated C.H.A.'s policies by providing false information by signing in Neil Danota, William K. Small, and Cheryl Jue for the purpose of visiting her, instead, they were found in another tenant's apartment. Ms. Herring signed these individuals in; aiding and conducting a subversive meeting against the C.H.A. ...

(Pl.'s Statement of Material Facts, Ex. U.)

The applicable written CHA policy, the "Visitation Policy", states, in relevant part, as follows:

> 1. Visitors will be admitted to CHA housing under the following conditions:
> (a) The guest upon entry to a CHA building will identify himself to CHA personnel. While CHA personnel may request that a guest provide independent verification (by printed I.D. or otherwise) of the guest's identity, no guest

shall be required to provide independent verification of their [sic] identity.....

(b) The tenant, either prior to or at the time of the visit, shall advise the CHA that a person is a guest of the tenant.... Upon confirmation by the tenant that the guest should be admitted to the building, the guest shall be so admitted.... In all circumstances, if a tenant confirms that a person is an invited guest, CHA personnel shall admit the named guest to the building,....

(Second Am.Compl., Ex. A.)

A review of Herring's Notice of Termination, in conjunction with section 247.4(a) and with the Visitation Policy, reveals three points that govern the Court's analysis: (1) Defendants may terminate Herring's lease only for reasons stated in the notice of termination, see 24 C.F.R. § 247.4(a) (1990); (2) Herring's notice of termination contained, at best, two explanations for the notice of termination: (a) she violated CHA policy by providing false information in signing in guests, and (b) signed in individuals "aiding and conducting a subversive meeting against the C.H.A."; and (3) neither reason provided in the notice of termination is expressly contained in the Visitation Policy. Therefore, for Defendants to justify the notice of termination, they must show either that the reasons given for termination are supported either by an interpretation of the Visitation Policy or by some other CHA policy.

As more fully explained below, the Court agrees with the implicit conclusion of the Magistrate Judge that Defendants' providing Herring with a notice of termination violated her First Amendment right of association. Despite the reasons given in the notice of termination, Defendants now argue that Herring was served with a notice of termination because the Defendants reasonably believed that she had permitted her guests to roam her building unescorted. Aside from the clear conclusion that the reason now proffered was not specifically contained in Herring's Notice of Termination, in violation of 24 C.F.R. § 247.4(a) (1990), the reason now proffered is not sufficient to withstand a Motion for Summary Judgment.

### c. The *Mt. Healthy* Case

The Court's analysis is governed by *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). In *Mt. Healthy*, the Supreme Court established a three pronged test to determine if official action constitutes a violation of a plaintiff's rights under the First Amendment, when such action might be constitutionally justified on some other basis. In order to prove his or her claim, a plaintiff must show: (1) that his or her conduct was constitutionally protected; and (2) the conduct was a substantial or motivating factor in the government decision to deny a benefit. *Id.* at 287, 97 S.Ct. at 576. If the plaintiff satisfies these requirements, the burden shifts to the Defendant to prove, by a preponderance of the evidence, that the benefit would have been denied even in the absence of the protected conduct. *Id.*

Here, the parties dispute two elements of the *Mt. Healthy* test. They agree that Herring's conduct was constitutionally protected. However, Defendants contend that the conduct was not a "substantial or motivating factor" in their decision to serve Herring with a notice of termination. Defendants also dispute the "causation" of Herring's notice; they contend that the notice of termination would have been served on Herring even in the absence of the protected conduct. In the opinion of the Court, Defendants have failed to create a genuine issue of material fact as to either of these two contentions.

### i. Substantial Motivating Factor

Defendants' contention that protected conduct did not play a substantial or motivating role in the issuance of the notice of termination is conclusively refuted by the notice itself. The notice states that by signing in three individuals under false names, Herring was "aiding and conducting a subversive meeting against the CHA." This statement is sufficient evidence from which to conclude that Herring's protected conduct, her right to associate with protestors, was a substantial factor leading to the notice of termination. In addition, Defendant Shepard admitted in her deposition that one of the reasons given Herring for the issuance of the notice, or "term", was Herring's signing in of

three people "who had attacked the management office on May 1." (Pl.'s Statement of Material Facts, Ex. G. at 126.) Defendants also admit that Shepard wrote a note in Herring's Historical Report indicating that Herring "allowed protestors." (Defs. Resp. to Pl.'s Statement of Material Facts ¶ 34; Pl.'s Statement of Material Facts, Ex. S.) Defendant Peoples gave Defendant Shepard approval to terminate Herring's tenancy subject to the decision of the legal department. (Defs.' Resp. to Pl.'s Statement of Material Facts ¶ 35.) In an inter-office memo from Shepard to Peoples noted with the subject "Termination of Tenancy", Herring is referred to as "an alleged protestor", she and the guests are called members of the " 'Fight the Power' Militant Group", and the memo indicated that Herring's signing in of the guests was "aiding and conducting a subversive meeting against C.H.A.. [sic]" (Pl.'s Statement of Material Facts, Ex. T.) The memo makes no mention of the guests being unaccompanied. Herring also contends that on May 4, 1990, Barbara J. Davis, the CHA's Coordinator of Contract Security, told Herring that Herring was in trouble for signing in protestors. Davis says nothing about the purported conversation in her affidavit. (*See* Defs.' Resp. to Pl.'s Statement of Material Facts, Ex. AA.) [2] Moreover, the notice of termination claims that Herring was terminated for signing in three people who were arrested on May 1: Neil Danota, William K. Small, and Cheryl Jue. However, the evidence submitted to the Court indicates that the actual names of the individuals were: Cheryl Jue, also known as "Terry", Fred Johnson, and "Ariel." Only one of the arrested individuals listed on the notice, Ms. Jue, was actually signed-in by Herring. The other two individuals listed on the notice, Neil Danota and William K. Small, were not related to the May 3 incident at all. (*See*

Defs' Ex. K at 12–14, 20.) Instead, Danota and Small were two of the four protestors arrested on May 1. These errors in the names of the individuals involved further illustrates that the CHA was concerned with the fact that they thought the individuals were protestors, not that they were unaccompanied.

Defendants argue that there is "room for dispute" as to whether Herring's association with protestors was a "motivating factor." They contend that "the CHA reasonably believed Herring violated policy by signing the individuals in and not escorting them through the building . . . ." (Defs.' Objections to Report & Recommendation on Cross Summ. J.Mots. at 4.) There are three flaws with this contention. First, this reason is not given in the notice of termination. Second, it is difficult for this Court to determine that Defendants acted "reasonably" regarding the notice of termination given that they failed to determine, from the time of the incident on May 3, 1990 to the time the notice was issued, on May 31, 1990, whether the individuals were escorted or not. Third, whatever other purported reasons for the termination, those reasons cannot alter the face of the termination notice, which clearly includes protected conduct as a reason for its issuance. [3] There is no genuine issue of material fact over whether Herring's conduct was a substantial or motivating factor in the issuance of her notice of termination. It was.

### ii. Causation

Defendants also contend that the Magistrate Judge erred in finding that the Defendants failed to show, by a preponderance of the evidence, that the notice of termination

---

**2.** Defendants deny the conversation and cite page 92 of their Exhibit V. to Defendants Response to Plaintiff's Statement of Material Facts as to Which There is no Genuine Issue. That exhibit is the deposition of Defendant Peoples. The page referred makes no mention of Davis, Herring, or the conversation.

**3.** Defendants state, without elaboration, that this language "merely describes the activity which occurred" in Richmond's apartment. No. The language at issue is clearly a stated reason for the issuance of the notice of termination; it describes what was wrong with Herring's decision

to use false names in signing in her "guests." This qualification was necessary to constitute a "serious" violation worthy of the issuance of a notice of termination. Without this qualification, the notice contained no stated reason that warranted a notice of termination. While using a false name might constitute a violation of the Visitation Policy, it apparently was not a "serious" violation. As indicated below, to constitute a "serious" violation, the use of a false, or "fraudulent" name, must result in a guest's unaccompanied access to the apartment building.

would have issued regardless of Herring's associational activity. Defendants contend that the notice of termination would have issued for one reason: at the time the notice was issued, they reasonably believed, in good faith, that Herring had signed in three people and had let them roam unaccompanied in the apartment building.

In order to demonstrate that the notice of termination would have been issued regardless of Herring's protected conduct, Defendants must show that Herring otherwise violated her lease agreement and that such a violation would normally have led to the issuance of a notice of termination. In the opinion of the Court, Defendants have failed to carry this burden by a preponderance of the evidence.

Herring's lease permits the CHA to terminate her tenancy only for "serious or repeated violations of material terms of the lease." (Defs.' Mot.Summ.J.App., Ex. Q. ¶ 14.) The lease does not specify which, if any, violations of the CHA Visitation Policy constitute "serious or repeated violations," The lease only gives examples, by way of reference, of what grounds constitute "serious or repeated violations." (Defs.' Mot. Summ.J., Ex. Q. ¶¶ 9, 14.) The evidence submitted in this case indicates that not all violations of the Visitation Policy constitute "serious or repeated violations." For example, according to Defendant Peoples, a tenant's signing in with a nickname or only a first name, while a violation of the Visitation Policy, is not sufficient grounds for eviction. (Pl.'s Statement of Material Facts, Ex. F at 52–53, 63.) In contrast, a Defendant's "fraudulently" signing someone in is a serious, or "major" violation. (Pl.'s Statement of Material Facts, Ex. F at 63–64.) However, according to Defendant Peoples, the "fraud" does not depend upon falsity, but whether the guests are accompanied. (Pl.'s Statement of Material Facts, Ex. F at 64.)[4] Therefore, in order for Herring to have com-

mitted a violation worthy of her lease being terminated, Herring must have signed-in her guests and then left them unaccompanied.

It is now undisputed that Herring did not violate her lease agreement on a ground sufficient to terminate her lease. Defendants have implicitly conceded that had they known that Herring was in Richmond's room with her three "guests", no notice of termination would have issued.[5] In other words, Defendants best contention is that Herring was mistakenly issued a notice of termination based on the incorrect assumption that she left her guests unattended. Defendants contend that the issuance of the notice was done "reasonably and in good faith", despite the fact that: (1) the notice facially contains an invalid reason for termination; (2) the reason now given for the issuance of the notice of termination was not itself contained in the notice; (3) the notice referred to protestors who were not related to the May 3 incident; and (4) the Defendants had twenty-seven days, in which to investigate the facts of the incident, from the date of the incident to the time in which the notice was presented to Herring.

In the opinion of the Court, Defendants do not create a genuine issue of material fact as to the causation of the issuance of Herring's termination letter by stating that they would otherwise have mistakenly issued an illegal notice. Regardless of Herring's conduct, the notice at issue here was served without notifying Herring of the now claimed actual reason for its issuance, a violation of 24 C.F.R. § 247.4(a) (1990), and without sufficient inquiry into the facts underlying that reason.

Defendants' position is further weakened by the fact that they have not introduced a single piece of evidence that the CHA regularly, or normally, issued notices of termination for Visitation Policy violations. However, violations of the Visitation Policy similar to the type of violation of which Herring is now accused were, apparently, "not uncom-

---

4. This is apparently true because the Visitation Policy does not require verification of a guest's identification. (Defs.' Resp. to Pl.'s Statement of Material Facts ¶ 15.) The Defendants admit that a guest will be admitted to the building if he or she identifies himself or herself as "Yogi Bear." (Id.)

5. The Defendants have represented to the Court that they withdrew their state court eviction action against Herring once they determined that Herring had accompanied her "guests" to Richmond's room.

mon." For example, according to Defendant Peoples, it was "not uncommon" for a resident to sign in a person seeking to enter the building without being invited, permitting that person unaccompanied access to the building. (Pl.'s Statement of Material Facts, Ex. F. at 56, 63–64.)

Despite the "not uncommon" nature of Herring's alleged violation, Defendants have not provided the Court with evidence of a single lease termination based on that conduct. In fact, at her deposition, Peoples could recall only a total of two tenants, other than Herring, whose tenancies were terminated due to the tenants' violations of the Visitation Policy. (Pl.'s Statement of Material Facts, Ex. F. at 73–74.) Both of those tenants, Ms. Grace King and Ms. Sheila Fason, saw their tenancies terminated for their refusals to present their IDs and for being "generally uncooperative to the Development entrance procedure." (Pl.'s Statement of Material Facts, Ex. XYZ.) King and Fason were issued notices of termination only after persistence in their violations, and "[i]n spite of repeated counselling." (Pl.'s Statement of Material Facts, Ex. XYZ.)[6] In contrast, Herring was never personally counselled before her termination notice was issued.[7] Furthermore, when asked if Herring's tenancy would have been terminated if the people she had signed in had not been protestors, Defendant Peoples responded with "I cannot say." (Defs.' Resp. to Pl.'s Statement of Material Facts, Ex. V. at 151.) Such evidence is hardly enough to carry a burden based on the "preponderance of the evidence."

The evidence submitted indicates that despite the fact that "serious" violations like that now attributed to Herring are "not uncommon", there have been no notices of termination, aside from Herring's, issued for that conduct. Whether other notices were issued but not submitted as evidence, the Court does not know. As the burden of submission of such evidence was clearly the Defendants', they cannot create a material issue of fact out of the absence of such evidence.

Given the evidence of retaliation against Herring, the fact that Herring did not actually commit a "serious" violation of her lease, and the Defendants' failure to provide the Court with evidence that a notice of termination would normally be issued in the circumstances as explained by the Defendants, the Court concludes that the Defendants have failed put forth sufficient evidence to create a genuine issue a material fact over their claim that the notice of termination would have been issued even in the absence of the protected conduct. Accordingly, the Court overrules Defendants' objection to the Magistrate Judge's Report and Recommendation with regard to this issue. The Magistrate Judge correctly concluded, albeit on somewhat different, and less specific, reasoning, that at least some of the Defendants violated Herring's First Amendment right to freedom of association by issuing the notice of termination.

The Court now turns to the remaining issues of responsibility for the violation and damages.

### 3. Responsibility

Plaintiffs' Complaint does not specify whether the Plaintiff has sued the individual Defendants in their individual capacities, in their official capacities, or both. Unless a plaintiff expressly indicates that a defendant is being sued as an individual, courts should construe an allegation that a defendant was acting under color of state law as a suit against that defendant in his official

---

6. It is uncertain what the noted "repeated counselling" designates. If this counselling was on an individualized basis, then Herring was clearly treated differently. If, however, this counselling was only through group counselling, Herring was not treated differently. The Court does not give this particular point a great deal of importance in either circumstance.

   As noted above, of primary importance is that fact that Herring was the only tenant whose lease was promptly subjected to termination for a violation of the Visitation Policy despite the fact that other violations, like hers, were "not uncommon."

7. Herring was, however, repeatedly counselled in group meetings regarding the sign-in procedures.

capacity only.[8] *Yeksigian v. Nappi*, 900 F.2d 101, 104 (7th Cir.1990). Since Plaintiffs fail to allege that the Defendants are being sued individually, the Court finds that they are sued only in their official capacities.

As a result, the individual Defendants remain in this case only as nominal Defendants, the CHA is the real party in interest since it will be liable for any damages recovered. *See Hill v. Shelander*, 924 F.2d 1370, 1372–73 (7th Cir.1991) (indicating that the municipality is the real party in interest in an official capacity suit). Thus, a suit against the Defendants in their official capacities is the legal equivalent of a suit against the CHA.[9]

■ The CHA is a municipal corporation organized under the Illinois Housing Authorities Act, Ill.Ann.Stat. ch. 67½, paras. 1–29(e) (Smith–Hurd 1989). In order to satisfy the requirements of an official capacity section 1983 action, or an 1983 action against a municipality, a plaintiff must demonstrate that the plaintiff's constitutional rights were violated, under color of law, as a result of a municipality's "policy or custom". *See Monell v. Department of Social Servs.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

■ There are several ways that a plaintiff may attempt to establish "policy or custom" for the purpose of imposing liability on a municipality. *See generally* Erwin Chemerinsky, *Federal Jurisdiction* § 8.5.2. (1989) (stating that there are five ways to demonstrate "policy or custom"). At issue here is whether the CHA had either an express or implied policy of terminating, or attempting to terminate, the leases of those tenants who associated with protestors. In the opinion of the Court, there is a genuine issue of material fact regarding the existence of any such policy. In this regard, the Court disagrees with the Report and Recommendation of the Magistrate Judge.

■ Here, Plaintiff might attempt to prove the existence of a policy or custom either through the acts, or knowing inaction, of the CHA's legislative body, its board, *see Auriemma v. Rice*, 957 F.2d 397, 399 (7th Cir.1992) (noting that a policy making body's knowing acquiescence in an officer or employee's conduct may constitute "custom" "with the force of legislation"), or through the acts of a "Final Policy Maker", *see Pembaur v. City of Cincinnati*, 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). In the opinion of the Court, Plaintiff is not entitled to judgment on either theory at this time.

With respect to the acts of the CHA's legislative body, the Magistrate Judge relies on three types of evidence to conclude that the CHA had a policy of retaliating against residents that associated with protestors: (1) a policy memorandum written by Defendant Lane and evidence about the implementation of the policy asserted therein; (2) the affidavit of a former CHA security guard, Alonza Dukes; and (3) the Notice of Termination.

Defendant Lane apparently issued a memorandum on May 3, 1990 (the "Lane Memo").[10] The effect of the Lane Memo is inconclusive as to the policy issue here at issue, i.e. the existence of a policy of retaliation against tenants for their association with protestors. The Memo states that the CHA Police and security staff had been instructed to prevent members of the Revolutionary Communist Party and the Campaign, and those associated with them, from accessing CHA property.[11] Despite the Lane Memo's

---

**8.** The Court notes that Plaintiff has not expressly alleged that the Defendants acted under "color of law." Although such an allegation is typically necessary to state a claim under section 1983, the Court holds that a reasonable inference from the Complaint is that each of the Defendants was acting under "color of law."

**9.** As a result, the issue of qualified immunity need not have been addressed by the Magistrate Judge or by the parties.

**10.** As the Magistrate Judge notes, the actual date of the Lane Memo has not been specified. The Memo itself discusses implementation of a policy on May 2. If the Memo governs the conduct of one or more of the Defendants on May 3, it must have been written and promulgated on or before that date. Plaintiff contends that the Memo was written on May 1, 1990. However, that conclusion is not sufficiently demonstrated by the record.

**11.** In its entirety, the Lane Memo reads:
CONFIDENTIAL
ATTORNEY/CLIENT PRIVILEGE
TO: Area Directors
FROM: Vincent Lane, Chairman
        Board of Commissioners

express statement that the orders contained therein had been effective as of May 2, 1990, the Defendants contend that the stated policy on the memo was never implemented. Whether the Memo went into effect or not remains at issue. Moreover, there is scant evidence linking the Lane Memo, or Lane himself, to the decision to terminate Herring's lease or to any policy of terminating tenant's leases in retaliation for associating with protestors.

While implementation of the policies contained in the Lane Memo might be construed to violate Herring's rights or the rights of certain protestors, none of the parties has pursued that argument in evaluating the Magistrate Judge's Report and Recommendation.[12] Instead, the parties have focused on the degree to which the Lane Memo is evidence of the implementation of a policy of retaliation against CHA residents that associate with protestors. Although the Lane Memo and other evidence relating to it are circumstantial evidence of a policy of retaliation, that evidence is insufficient support for summary judgment.

The only direct evidence of a policy of retaliating against residents who associate with protestors is the affidavit of Alonza F. Dukes. Dukes was working as a security officer for the CHA on May 3, 1990. Dukes claims that prior to that evening he was given the Lane Memo and other orders stating that "any tenant who associated with or signed-in protestors would jeopardize her lease." Dukes also claims that he spoke with B.J. Davis (Barbara J. Davis) of CHA's security office to confirm the orders. Dukes states that:

B.J. Davis confirmed to me that we were to report any time any tenant associated with or signed-in protestors because CHA's policy was that any tenant who associated with or signed in protestors jeopardized her lease.

SUBJECT: Demonstrations by the Revolutionary Community Party and the Campaign to End CHA Lockdown Group

There have been several demonstrations by the Revolutionary Communist Party; and a group known as the Campaign to End CHA Lockdown. These demonstrations have recently become violent in nature and resulted in injury to CHA employees and residents, and damage to property. Accordingly, CHA Police and CHA Staff in Contract Security were issued standing orders to prohibit any persons belonging to, or associated with, the above referenced groups from entering on CHA property;' and to escort such persons off CHA property wherever they might be found. Staff have also been instructed to effect arrests of any person belonging to these groups who attempts to enter upon CHA property; or if found on CHA property, refuses to leave. These orders have been effective since the violent May 2, 1990 demonstration at 2400 S. State, and will remain in effect until further notice.

You are directed to promptly instruct all Managers and Assistant Managers of this directive and to ensure their understanding of same.

The above directive applies only to persons belonging to, or otherwise affiliated with, the groups named above. *Other* groups or organizations who enter on to CHA property to protest and/or distribute literature may do so *PROVIDED THEY REMAIN PEACEFUL AND RESPECTFUL OF THE RIGHTS OF EMPLOYEES RESIDENTS AND THEIR GUESTS; AND DO NOT ENGAGE IN ANY ACTS OR ACTIVITY WHICH THREATEN OR DISTURB THE HEALTH, SAFETY AND WELFARE OF TENANTS OR EMPLOYEES.* Such groups shall be restricted to the grounds and parking areas provided that they do not impede or restrict normal pedestrian and/or vehicular use and access; and are prohibited from entering any management or work spaces or community areas, or any area above the first floor.

Staff should contact the CHA Police Department at 4947 South Federal and Contract Security at 540 East 36th Street in any instance where demonstrators or protesters gather on or near CHA property, regardless of whether the demonstration/protest is peaceful or otherwise. CHA Police and Contract Security personnel will then monitor the situation and take action as may be appropriate. If *any* demonstration or protest becomes, or threatens to become, violent in nature; and if CHA Police or Contract Security are unavailable, management staff are authorized to immediately contact the Chicago Police Department, and take the necessary action (normally filing a complaint) which enables the police to make any arrests which may be necessary to protect the lives and property of CHA residents and employees.

Written reports of all such incidents should be promptly prepared and forwarded to this office with copies to the Legal Department, and the Office of External Affairs.

Vincent Lane, Chairman
Board of Commissioners

12. Accordingly, the Court makes no statement or holding as to this issue. While raised in Plaintiff's Complaint, the issue has not been briefed by the parties and will not be addressed by the Court *sua sponte.*

(Pl.'s Statement of Material Facts, Ex. Q. ¶ 12.) Dukes also states that:

It is and has always been my understanding of the CHA policy as stated in Exhibit B [the Lane Memo] and clarified by other documents that leaseholders who associated with or signed-in protestors jeopardized their tenancies.

(Pl.'s Statement of Material Facts, Ex. Q. ¶ 13.) In addition, the Plaintiff states that on May 4, she passed Davis in the lobby of her building and was told by Davis that she had violated CHA Policy by signing in protestors. (Pl.'s Statement of Material Facts, Ex. A. at 48–50.) These statements raise the issue of a policy of retaliation. However, the Affidavit of Barbara J. Davis directly contradicts Dukes's Affidavit. Davis states that no policy of retaliation existed, (Defs.' Resp. to Pl.'s Statement of Material Facts, Ex. AA. ¶ 5), and that she did not speak with Dukes on the night in question, (Defs.' Resp. to Pl.'s Statement of Material Facts, Ex. AA ¶ 6). Therefore, like the Lane Memo, the Dukes Affidavit is insufficient evidence to support summary judgment. Plaintiff's statement is similarly insufficient.

Lastly, the Report and Recommendation relies on Herring's Notice of Termination. As discussed above, the Notice clearly indicates that the reason, or one of the reasons, for its issuance was Herring's association with protestors. However, the Notice is not conclusive evidence that Notice was issued pursuant to CHA policy. In the opinion of the Court, the Notice might be read either as a statement that both reasons given therein, that Herring provided false information at the sign-in and that Herring aided and abetted a "subversive meeting", constituted violations of CHA policies, or as a statement that only the first reason violated CHA policies. Since either reading is reasonable, the Court concludes that this issue must be resolved by the finder of fact.

Plaintiff might also attempt to show that any of the individual Defendants was a "final policy maker" and that such a person's acts constituted CHA policy. The best candidate for a "final policy maker" is Defendant Lane. To be a "final policy maker", an official must actually make municipal policy, rather than just carry it out. Whether Lane is a "final policy maker" remains an open question. While the Defendants have admitted that he was responsible for directing and implementing CHA policy during May of 1990, (Defs.' Resp. to Pl.'s Statement of Material Facts ¶ 9), it is unclear whether Lane performs this function solely as an executive or if he has the equivalent of legislative authority as required in *Auriemma v. Rice*, 957 F.2d 397 (7th Cir.1992). Although the record is somewhat vague on the degree to which Lane reports to the other members of the CHA board, it does seem that Lane has the authority to act for the board and to make its policy. In contrast, it is apparent that Defendants Peoples, Shepard, and Eddins all serve solely as "executors" of policy and therefore none can provide the Defendants with the needed "final policy maker." *See Auriemma v. Rice*, 957 F.2d at 400 (explaining that an executive is not necessarily a "final policy maker" even if the executive is the final decision maker on a particular action; to be a "final policy maker", an executive having final decision authority must generate, not merely execute, the municipality's policy).

Even if the Court were to assume that Lane is a "final policy maker" wielding legislative authority, Plaintiff has failed to demonstrate sufficiently that Lane took any action or made any decision that resulted in her constitutional injury. As indicated above, there is a genuine issue of material fact regarding the effect of the Lane Memo on the CHA officials' decision to serve Herring with a notice of termination. Since there is circumstantial evidence of Lane's actual involvement, and the use of his memo, in the serving of the notice of termination, the Defendants are not entitled to judgment as a matter of law.

Accordingly, the Defendants' objection to the Report and Recommendation on the issue of municipality liability is sustained. In the opinion of the Court, there exists a genuine issue of material fact with respect to whether Herring's Notice and the reasons stated therein were served on Herring pursuant to CHA policy. On this record, neither

party is entitled to judgment as a matter of law on this issue.

### 4. Remedies

 With respect to all of Defendants' claims, there is no evidence in the record indicating a risk that in the future the Defendants will repeat the actions complained of in this case. Accordingly, the Court finds that Plaintiff is not entitled to any declaratory or injunctive relief. However, given that the Court finds, in this decision, that Herring's Notice of Termination was issued in violation of her First Amendment right of association, the Court holds that the Notice of Termination was invalid. In addition, by accepting rental payments from Herring, the CHA has waived any right to proceed against her arising out of the events leading to this lawsuit. Therefore, Herring need not fear being evicted on the subject matter of this lawsuit.

With respect to Herring's claim for damages based on the violation of her First Amendment rights, several issues remain open. As indicated above, Plaintiff has proven that her rights were violated but she has failed to prove, as a matter of law, that the violation resulted from municipal policy and custom. Since the Plaintiff has failed to demonstrate that any Defendant is individually responsible for damages, Plaintiff is not entitled to a damage award at this time.

Should Plaintiff later demonstrate that her rights were violated by municipal policy and custom, she may be entitled to compensatory damages. These damages may include out-of-pocket loss and other monetary harms, and such injuries as impairment of reputation, personal humiliation, and mental anguish and suffering. However, the extent of Plaintiff's damages, if any, remains to be demonstrated. Since May 3, 1990, Herring has not been interfered with in any way by the CHA with respect to the signing in of or visitation by her guests. (Pl.'s Am.Resps. to Defs.' Request for Admission ¶ 46.) From May 3, 1990 to the present, Herring did not consult with any psychologist, psychiatrist or any other mental health care practitioner. (Pl.'s Am.Resps. to Defs.' Request for Admission ¶ 48.) Plaintiff has made no other evidentiary showing regarding any element of damages. Because the damage issues in this case, including the issue of punitive damages against a municipality, have not been properly briefed to the Court, and because the Court's holding still leaves several liability issues unresolved, those issues must be resolved at a later date.

### CONCLUSION

Each Motion for Summary Judgment is granted in part and denied in part. Plaintiff is not entitled to recover on her due process, United States Housing Act, and lease claims. With regard to those claims, Defendants' Motion for Summary Judgment is granted; Plaintiff's Motion is denied. With respect to Plaintiff's First Amendment claim, Plaintiff has proven that her right of association under the First Amendment was violated. With respect to that issue, Plaintiff's Motion for Summary Judgment is granted and Defendants' Motion is denied. However, with respect to the issues of the CHA's liability and damages, both parties' motions are denied without prejudice. On those issues, at this time, neither party is entitled to judgment as a matter of law.