648 A.2d 1273

**Joseph J. BALENT and George Barto,**

v.

**CITY OF WILKES–BARRE, Appellant.**

Commonwealth Court of Pennsylvania.

Argued April 12, 1994.

Decided Sept. 22, 1994.

Petition for Allowance of Appeal Granted Dec. 29, 1994.

558

Christine Mayernick for appellant.

Mark A. Ciavarella, Jr. for appellees.

Before SMITH and PELLEGRINI, JJ., and KELTON, Senior Judge.

KELTON, Senior Judge.

The City of Wilkes–Barre (City) appeals from the June 9, 1993 judgment of the Court of Common Pleas of Luzerne County (trial court) which denied the City's motion for post-trial relief and affirmed a jury verdict of $30,000 in favor of Joseph J. Balent and George Barto (Owners). Claiming that the City had razed the Owners' fire-damaged building without giving the Owners prior notice, the Owners had sought damages under 42 U.S.C. § 1983 (Section 1983)[1] for an alleged violation of their right to procedural due process under the 5th and 14th Amendments of the United States Constitution. We affirm the judgment.

## ISSUES

On appeal, the City argues: 1) that the question of the City's liability has already been litigated in a prior eminent domain action and that the Owners were collaterally estopped here from seeking civil rights damages under Section 1983; 2) that the trial judge erred in his jury instructions on Section

1. § 1983 Civil action for deprivation of rights
    Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

1983 damages; and 3) that the evidence was insufficient to permit the jury to find that the City was liable under the federal civil rights statute for failure to give notice to the Owners before destroying their building.

The Owners argue that the judgment in the eminent domain action did not estop them from maintaining the Section 1983 action; that there was sufficient evidence of reckless or wanton conduct to establish a pattern, practice or custom of unconstitutional activity; and that the trial judge correctly charged the jury on the City's potential liability for a civil rights violation.

## BACKGROUND

On March 9, 1980, the Owners' property, a two-story frame building, was destroyed by fire. One day after the fire, Thomas Hughes, the Chief Building Inspector for the City, mailed the following form letter notice to the Owners:

On *March 9, 1980* fire damaged your building at the above address to such an extent it is a fire, health, and physical hazard to occupants and the public in violation of the Wilkes–Barre City Building Code, Ordinance No. 32 of 1976, and Ordinance No. 16 of 1971 of the Wilkes–Barre Housing Code.

You are hereby ordered to have the building enclosed within ten (10) days of this notice and to correct all violations to comply with the Codes of the City of Wilkes–Barre or have the building razed. This work must be completed not later than *April 9, 1980.*

If this order is not complied with, it will result in legal action which may result in a fine or imprisonment.

Any person aggrieved by the decision of the Building Inspector may within ten (10) days of this notice appeal to the Board of Appeals for a review of the decision in accordance with the procedures prescribed by the board.

(R.R. 276a.) (Emphasis in original). Owners did not file an appeal.

The City's Bureau of Housing allegedly sent Owner Barto a letter dated May 18, 1981 in which he was informed that the building must be enclosed by the Owners within 10 days and all violations corrected or the building razed no later than June 16, 1981. The letter (if in fact it was sent) further informed Owner that:

If this order is not complied with on or before *June 26, 1981* the above property will be razed by the City of Wilkes–Barre under Wilkes–Barre City Housing Code Ordinance No. 16 of 1971.

(R.R. 259a.) The letter also informed Barto that he had the right to appeal that order within 10 days. However, there was testimony at trial by Barto and by the City's Assistant Housing Administrator which was sufficient to permit the jury to conclude that the May 18, 1981 letter was never sent. (R.R. 73a, 136a.)

By letter dated June 3, 1981, Owner Barto was again informed that he must correct the code violations by June 10, 1981; but the June letter did *not* state that the City would raze the building if the Owners failed to correct the violations.

Owners did not take any action to correct the building code violations and on December 14, 1981, the City hired a construction company which proceeded to demolish the building.

Prior to the cause of action which is the subject of this appeal, the Owners had filed a complaint against the City in the Court of Common Pleas of Luzerne County requesting that the court appoint a Board of Viewers pursuant to the Eminent Domain Code to determine the damages incurred in an alleged de facto condemnation of the building. The City filed preliminary objections in the nature of a demurrer which the trial court sustained. The Owners appealed the trial court's decision to this Court at No. 2180 C.D.1983. We affirmed the court's order to sustain the preliminary objections and dismiss the complaint. *Balent v. City of Wilkes–Barre*, 89 Pa.Commonwealth Ct. 578, 492 A.2d 1196 (1984) (Hereinafter "Balent I"). The Supreme Court denied the

Owners' petition for allowance of appeal at No. 792 E.D. Allocatur Docket 1985.

On May 14, 1985, the Owners filed a complaint in the instant proceeding against the City in the Court of Common Pleas of Luzerne County. In their complaint, the Owners allege that the actions taken by the City in demolishing their building deprived them of a right, privilege and immunity secured by the 5th and 14th amendments of the U.S. Constitution. Owners sought damages pursuant to Section 1983.

## MOTION FOR SUMMARY JUDGMENT

■ Because the parties quite appropriately proceeded to jury trial following the trial court's denial of the City's motion for summary judgment, we will not apply our normal scope of summary judgment review which would have been to determine whether the trial court made an error of law or abused its discretion in its ruling on the motion. *See Salerno v. LaBarr,* 159 Pa.Commonwealth Ct. 99, 632 A.2d 1002 (1993) for a review of the normal scope of review standards.

■ Here, we merely determine that the City by filing its motion, preserved for appellate review the question of whether this cause of action is barred under the doctrine of *res judicata* or collateral estoppel. For *res judicata* to apply, there must be a concurrence of four conditions: (1) identity of the thing sued upon or for; (2) identity of the causes of action; (3) identity of the person and parties to the action; and, (4) identity of the quality or capacity of the parties suing or being sued. *Iwinski v. Commonwealth, State Horse Racing Commission,* 85 Pa.Commonwealth Ct. 176, 481 A.2d 370 (1984).

■ Collateral estoppel will apply only when the issue decided in the prior adjudication was identical with the one presented in the later action; when there was a final judgment on the merits; when the party against whom the plea is asserted was a party or in privity with a party to the prior adjudication; and, when the party against whom it is asserted has had a full and fair opportunity to litigate the issue in question in a prior action.

The City argues that the trial court erred in declining to grant its motion for summary judgment on the issue of collateral estoppel and *res judicata* on the basis of the prior action filed by Owners. The City contends that the prior eminent domain action litigated all the issues before the trial court in this constitutional tort cause of action.

Specifically, the City argues that it was decided in the prior action that, in demolishing the building, the City had relied upon the emergency provision in the ordinance which allows the building inspector to cause the necessary work to be done where the building poses an actual and immediate danger to life or property; that the Owners had failed to exhaust their administrative remedies to object to the demolition order; that the Owners were given notice that the building posed a safety hazard; that the Owners had been given notice that they could appeal the building inspectors decision to the Board of Appeals; and, that the Owners had no standing to contend that there was a de facto taking of their property.

Neither *res judicata* nor collateral estoppel applies to this cause of action. While the parties to both causes of action are the same, the prior action between the Owners and the City involved an *in rem* eminent domain proceeding. In *Balent I* we held that an "otherwise valid" exercise of the police power does not effectuate a constitutional taking of property for public use. 89 Pa.Commonwealth Ct. at 581, 492 A.2d at 1197. This second lawsuit is one based on theories of trespass and constitutional torts and raises the issue of whether the police power was in fact validly exercised under Section 1983. The eminent domain proceeding did not litigate and decide whether the City violated the Owners' constitutional rights to due process under the 5th and 14th amendments. The eminent domain proceeding merely determined that the City's actions in demolishing the Owners' property were an exercise of the police power and did not amount to a compensatory taking under the Eminent Domain Act. *Balent I* did not hold that the City's power was exercised in a valid manner under the federal civil rights statute.

For those reasons, we find that the trial court did not err in holding that the civil rights action was not barred by the unsuccessful eminent domain action.

## MOTION FOR COMPULSORY NON–SUIT

The City further argues that the trial court erred in denying its motion for a compulsory non-suit at the close of Owners' case, i.e. that there was no evidence of a pattern or practice of unconstitutional activity on the part of the City as required for recovery under Section 1983. We will address the merits of the City's argument regarding the requirements of Section 1983 in the next section of this opinion. Here, however, we will not review the denial of the motion.

■ Following the completion of the plaintiff's case, the City's counsel made a motion for compulsory nonsuit. Following the denial of the motion, the City then chose to offer evidence (R.R. 195a), thus rendering moot the question of whether or not the trial court erred in denying the City's motion for a non-suit. As the Supreme Court has noted:

We hold that the refusal of a motion for nonsuit is not a valid reason for a new trial in this or any case where the defendant offers testimony. A defendant's right to request a non-suit is based on his offering no evidence, and the court cannot grant a non-suit after the introduction of evidence by the defendant.... If a non-suit motion made at the close of the plaintiff's case is refused by the trial judge, the defendant has an option either to rest on that motion and present no evidence, or put in a case. If the defendant elects to proceed, ... the non-suit stage is over, and the correctness of the court's ruling is moot.

*F.W. Wise Gas Co. v. Beech Creek Railroad Co.*, 437 Pa. 389, 391–92, 263 A.2d 313, 315 (1970).

## JURY CHARGE ON SECTION 1983 LIABILITY

The trial court charged the jury on the issue of the City's liability under Section 1983 as follows:

To prevail against a municipal corporation, such as the Defendant herein, the City of Wilkes–Barre, under Section 1983; however, the Plaintiffs must show that a governmental policy or custom was responsible for the constitutional violation alleged or was the result of a single act of a high ranking official.

A custom may be entered [sic] from acts or omissions of municipality supervisory officials serious enough to constitute reckless conduct, gross negligence or gross constitutional rights of the Plaintiff, whether or not such custom as [sic] received approval through official decision-making challenges.

Reckless conduct is intentional acting or failing to act in complete disregard of a risk of harm to others which is known or should be known to be highly probable and with a conscious indifference to the consequences. Reckless conduct is acting or failing to act when existing danger is actually known and with an awareness that harm is reasonably certain to occur.

(R.R. at 241–42a.)

██ A jury charge constitutes reversible error where it is erroneous and harmful to the complaining party. *Leaphardt v. Whiting Corporation,* 387 Pa.Superior Ct. 253, 564 A.2d 165 (1989). A motion for a new trial should be granted where a reading of the jury charge against the background of the evidence reveals that the jury charge might have been prejudicial to the complaining party. *Lilley v. Johns–Manville Corp.,* 408 Pa.Superior Ct. 83, 596 A.2d 203 (1991). We find that a reading of the jury charge as a whole reveals that the court did not erroneously charge the jury with the law of Section 1983 municipal liability and thereby did not prejudice the City.

The City argues that the trial court erred in its charge to the jury concerning a municipality's liability for acts of its employees because there was no evidence of a pattern, practice or custom of unconstitutional activity by the City.

In *Monell v. Department of Social Services of New York,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the Supreme Court exhaustively examined the legislative history behind the language of Section 1983 and concluded that municipalities could be sued for violating constitutional rights under that section. The Supreme Court concluded as follows:

> [T]he language of § 1983, read against the background of the same legislative history, compels the conclusion that Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort. In particular, we conclude that a municipality cannot be held liable solely because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory.

*Id.* at 691, 98 S.Ct. at 2036.

The Supreme Court found that when the execution of official government policy or custom inflicts injury, municipal liability under Section 1983 may occur. It is not the acts of its employees or agents which creates the liability. However, the Court expressly stated that "we have no occasion to address, and do not address, what the full contours of municipal liability under [Section] 1983 may be.... [W]e expressly leave further development of this action to another day." *Monell,* 436 U.S. at 695, 98 S.Ct. at 2038.

The City policy, as set forth in the ordinances, requires *written* notice to the owners of a property before it can be razed. Section 1009.1 directs the city employees as to the type of notification they must give a property owner when a violation of the Housing Code exists. Section 1009 provides that the minimum notice should be in writing, include a description of the real estate, specify the violations that exist and the remedial action required, allow reasonable time for performance, indicate that an appeal procedure exists and indicate which violations may require a city permit in order to correct the violation. The notice should be given to the property's owner either by personal delivery, through a notice of violation, by leaving the notice with a responsible person in

the family, or by sending the letter certified mail. If the letter is returned to the office unclaimed, notice is to be posted on the property.

The City argues that the jury charge gave the jury the impression that the City could be responsible under a theory of respondeat superior because a City employee violated this policy. We disagree. The jury charge informed the jury that the City could be liable if the Owners showed "that a governmental policy was responsible for the constitutional violation *OR* was the result of a single act of a high ranking official." (R.R. at 241–42a.) (Emphasis added).

The May 18, 1981 letter informing the Owners that their building would be razed, which the jury could find the Owners never received, was signed by Joseph Chabala, the City's Chief Housing and Zoning Officer. We believe that the trial judge could conclude as a matter of law that he was a person "whose edicts or acts may fairly be said to represent official policy." *Parkway Garage, Inc. v. City of Philadelphia,* 5 F.3d 685 (3d Cir.1993).

*Parkway* involved a civil rights claim filed against the City of Philadelphia and the Philadelphia Parking Authority (Authority). Parkway is a parking garage which is located on Philadelphia city property leased to the Authority. The land was subleased for 36 years by the Authority to John McShain, Inc., which agreed to build and operate a parking garage on the property. In its complaint, Parkway alleged that Philadelphia and the Authority misused the police power to benefit themselves as landlord and garage owner.

Based on a report it commissioned, Philadelphia determined that Parkway's sale price is limited by the long-term lease to John McShain, Inc. Philadelphia city officials closed the entire garage without notice, claiming it was in imminent danger of collapse. The closing took place pursuant to a meeting of high Philadelphia city officials and Authority officials at Mayor Wilson Goode's office. Parkway claimed that the garage was not in imminent danger of collapse and that

the City of Philadelphia and the Authority conspired to close the garage to benefit themselves.

The jury and the Third Circuit agreed with Parkway. The jury found that Parkway's right to due process was violated by the City of Philadelphia. It further found that the Authority and the City of Philadelphia conspired to deprive Parkway of its right to due process. The Third Circuit found that "the jury could have reasonably found that the City's and the Authority's actions leading up to the closing of the garage belie a proper motive for the closing." 5 F.3d at 693. The Court further found that the Mayor ordered the closing and that the jury could properly conclude that the Mayor knew of and personally possessed improper motives for closing the garage.

To hold the City of Wilkes–Barre liable for municipal policy or procedure under *Parkway*, "scienter-type evidence must have been adduced with respect to a high-level official determined by the [trial] court, in accordance with local law, to have final policymaking authority in the areas in question." *Parkway*, 5 F.3d at 692 (quoting *Simmons v. Philadelphia*, 947 F.2d 1042, 1063 (3d Cir.1991)). Moreover, under *Parkway*, the plaintiff must produce sufficient evidence that the high-ranking official knew of or recklessly disregarded relevant facts concerning the improper actions taken by the City. Recklessness is " '[f]ailure of a municipality to fulfill a duty to guard against foreseeable harm when its officials have knowledge of circumstances making that harm likely.' " *Parkway*, 5 F.3d at 693 (quoting *Simmons*, 947 F.2d at 1090).

The Chief Housing and Zoning Officer, Joseph Chabala, signed the May 18, 1981 letter informing the Owners that their building would be razed unless they complied with the ordinance. The jury could reasonably find that Owners never received that letter. Joseph Chabala never determined that the Owners had received that letter before the demolition of their building occurred.

The Supreme Court has stated that "an unconstitutional government policy could be inferred from a single decision

taken from the highest officials responsible for setting policy in that area of the government's business." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123, 108 S.Ct. 915, 924, 99 L.Ed.2d 107 (1988). Only persons who have "final policymaking authority" may subject the government to Section 1983 liability. Whether one has "final policymaking authority" is a question of state law, but "the challenged action must have been taken pursuant to a policy adopted by the official or officials responsible under state law for making policy in that area of the city's business." *Id.* at 123, 108 S.Ct. at 924.

In *Jett v. Dallas Independent School District*, 491 U.S. 701, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989), the Supreme Court stated that " 'whether a particular official has 'final policy making authority' is a question of state law.' " *Jett*, 491 U.S. at 737, 109 S.Ct. at 2723 (quoting *St. Louis v. Praprotnik*, 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988)). The Court further stated in *Jett* that "the identification of those officials whose decisions represent the official policy of the local governmental unit itself is a legal question to be resolved by the trial judge before the case is submitted to the jury.... [T]he trial judge must identify those officials or governmental bodies who speak with final policy-making authority for the local governmental actor concerning the action alleged to have caused the particular constitutional or statutory violation at issue." *Jett*, 491 U.S. at 737, 491 U.S. at 2724. *See also, Bennett v. City of Slidell*, 728 F.2d 762 (5th Cir.1984).

■ In his charge to the jury, the trial judge stated that to prevail against the City, the plaintiffs must show either a governmental policy or custom or that the constitutional violation was a result of a single act of a high-ranking official. It is implicit in this charge that the trial judge determined that the jury reasonably could find that the Chief Housing and Zoning Officer, Joseph Chabala, was a high-ranking policy-making official on whose actions the jury could impute municipal liability to the City. Therefore, the jury charge was not erroneous and the trial judge did not err in denying the City's motion for a new trial.

## JUDGMENT NOTWITHSTANDING THE VERDICT

Our scope of review of a denial of a motion for judgment notwithstanding the verdict is limited to determining whether the trial court abused its discretion or committed legal error. *United States Fidelity & Guaranty Co. v. Royer Garden Center and Greenhouse Inc.*, 143 Pa.Commonwealth Ct. 31, 598 A.2d 583 (1991), *petition for allowance of appeal denied*, 530 Pa. 663, 609 A.2d 170 (1992). We must view the record in a light most favorable to the Owners as verdict winners and grant them every inference. *Id.*

The City contends that the trial court erred by failing to enter a judgment notwithstanding the verdict in its favor arguing that the Owners failed to establish a pattern, policy or custom of unconstitutional activity on its part. We disagree and find that the evidence was sufficient to sustain a jury finding of a Section 1983 violation.

The evidence showed that the Owners received one notice in March concerning their building and another notice in June. The June letter did not inform the Owners of their right to appeal the building inspector's determination. In fact, the portions of the form letter which would have given appeal rights had been crossed out on the form. (R.R. at 263a.) Neither notice informed the Owners that failure to fix the violations would result in their building being razed. Further, there is evidence which the jury could believe that the Owners never received the May notice informing them that their building would be razed by the City if they did not comply with the ordinance. The City did not even post notice on the property as required under the ordinance. Also, the City did not act quickly in demolishing the building. It waited until December to raze the building without providing the Owners with any last minute notice despite the fact that one of the Owners often visited the building inspector's office.

Finally, because the City never perfected the notice as required under the ordinance, it essentially entrusted the building official with the final decision-making authority to raze the building, which he exercised.

██ Based on the evidence, we believe the jury could find a pattern or a series of acts by the City which denied the Owners their constitutional rights. The jury could also find gross negligence by a high-ranking, policy-making official. Therefore, the trial court did not abuse its discretion in refusing the City's motion for judgment notwithstanding the verdict.

For the reasons stated above, we affirm the order of the Court of Common Pleas of Luzerne County denying the City's motions for post-trial relief and entering judgment in favor of the Owners.

## ORDER

**AND NOW,** this 22nd day of September, 1994, the order of the Court of Common Pleas of Luzerne County at No. 5123–C of 1983 is hereby affirmed.

PELLEGRINI, Judge, dissenting.

I respectfully dissent. The majority characterizes a single inadvertent mistake on the part of the City's Chief Housing Officer—not insuring that notice had been perfected before demolishing an unsafe building—as establishing a policy imposing liability in a Section 1983 action on the City of Wilkes–Barre (City). While the Owners could avail themselves of state remedies, I would hold that Section 1983 liability does not exist for failure to receive notice when it was the result of a simple mistake.

On March 9, 1980, a building owned by Joseph J. Balent and George Barto (Owners) containing a tavern on the first floor and rental apartments on the second and third floors was severely damaged by fire. There was fire damage throughout the entire structure and through the roof causing considerable structural damage.

As a result of the fire, the Wilkes–Barre Bureau of Building Inspection began to undertake action against the property to have the Owners first secure and then either repair or demolish the property. It prepared three violation notices concern-

ing the building's condition, of which two were actually received.

On March 10, 1980, the City advised the Owners to "close" the building within 10 days and to correct all violations to the building by April 9, 1980. The notice informed the Owners that they had 10 days to appeal the decision to the Board of Building Review. No appeal was taken. There is no question that the Owners received this violation notice but took no action to abate the conditions.

On March 18, 1981, because the Owners had done nothing to repair the property, the City sent another violation notice to them stating that the building was going to be razed if repairs were not completed by June 26, 1981. It also notified Owners that the violation notice could be appealed to the Wilkes–Barre Board of Review. Although a PS Form 3800 receipt for certified mailing of this notice had been found as well as a PS Form 3811, the green card that is returned to a sender of certified mail evidencing its receipt with a postmark dated May 20, 1981, stamped on the back side, the City could produce no evidence of a card that was signed by Owners. **Owners *failed* to receive this notice and this is the basis for Owners' Section 1983 action.**

On June 3, 1981, having received no response from the Owners, the City sent a third violation notice to the Owners, stating that the repairs to the building were to be completed no later than June 10, 1981. No warning was given in this notice that the building was going to be razed if repairs were not made. However, this violation notice specifically said "THIS NOTICE DOES NOT SUPERSEDE VIOLATION NOTICE ISSUED 5–18–81." Owners received this notice but took no action to abate the conditions or inquire as to what was contained in the referenced May 18, 1981 violation notice.

Because Owners had made no repairs to the property and, since the fire, vandalism, rotting wood and wind damage had made the building unsafe and an immediate hazard, on December 14, 1981, the City contracted to have the building demolished. Under the emergency provision, if it finds that the

building constitutes an immediate danger, the City is to take immediate action to demolish the structure.[1]

After its Petition for the Appointment of Viewers alleging that the City's action in demolishing the building was a *de facto* take was dismissed, and an appeal to this court failed (*Balent I*), Owners filed a Section 1983[2] action claiming that because they did not receive the May 18, 1981 violation notice that their property was to be razed if repairs were not made, their building was taken without due process of law in violation of the Fifth and Fourteenth Amendments to the United States Constitution. After filing its answer, the City filed a motion for summary judgment claiming that either res judicata or collateral estoppel applied because of Owners' unsuccessful eminent domain proceeding. The trial court denied the motion and the case proceeded to a jury trial. The jury, finding that Owners' rights under the Constitution were violated, awarded Owners $30,000 in damages.[3]

On appeal, the City contends that the trial court erred as a matter of law in instructing the jury that Joseph Chabala, the

1. In *Balent v. City of Wilkes–Barre*, 89 Pa.Commonwealth Ct. 578, 492 A.2d 1196 (1984) (*Balent I*), we stated that the trial court found that "the City's Chief Building Inspector ordered the demolition under the emergency provision of Ordinance No. 32 of the Wilkes–Barre Code, Wilkes–Barre, Pa., Code § 7–23, Ord. No. 32–76, § 1 (1976), which provides as follows:

   *Emergency Work.* In case there shall be, in the opinion of the building inspector's office, actual immediate danger of failure or collapse of a building or any part thereof so as to endanger life or property, the building inspector's office shall cause the necessary work to be done to render said building or structure or part thereof, temporarily safe, whether the procedure prescribed in this section has been instituted or not."

2. The section states, in relevant part:

   "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress...." 42 U.S.C. § 1983.

3. Owners placed a value on the property of $37,000, while the City real estate appraiser placed a value on the property of *minus* $1,700 because the land was encumbered by the building.

City's Chief Housing and Zoning Officer (Chief Housing Officer) was a policymaker or that any of his actions could be considered to have instituted a policy not to perfect notice to property owners whose property was to be demolished because it was unsafe or open, vacant or vandalized. It contends that the Chief Housing Officer cannot be considered a policymaker because the City's policy is contained in the Wilkes–Barre Housing Code and it requires that notice be given to all property owners before any property is demolished, absent a finding that the property is in danger of immediate collapse. Because the evidence established that this was the only instance that a violation notice had not been sent out, the City contends that Owners were only able to establish that there was an inadvertent mistake, not a policy not to perfect notice before demolishing unsafe buildings.

The majority rejects that contention because "[t]he May 18, 1981 letter informing the Owners that their building would be razed, which the jury could find was never received, was signed by Joseph Chabala, the City's Chief Housing and Zoning Officer ... that the trial court could conclude as a matter of law that he was a person 'whose edicts or acts may fairly be said to represent official policy.'" Because the Chief Housing Officer cosigned this letter, the majority then goes on to hold that he is personally responsible for insuring that notice was perfected and his failure to check this one notice this one time is a policy upon which Section 1983 liability can be imposed on the City.

I disagree with the majority that Owners have established any policy or custom not to give notice prior to demolishing deteriorated properties because the City's Chief Housing Officer is not the policymaker who has the power to alter the notice requirements to be given to owners of property to be razed for failure to repair, and even if he was a policymaker, that any policy was created by his failure to perfect notice in this one case. Moreover, I disagree with the majority that *Balent I's* claim on issue preclusion does not bar or control the issues in this action.

## I.

Section 1983 provides a remedy against "any person" who, under color of state law, deprives another of a federally-protected right. In *Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the Supreme Court held that municipalities and other local governmental entities are persons to whom Section 1983 applies. 436 U.S. at 690, 98 S.Ct. at 2035–36. At the same time, the court made it clear that municipalities may not be held liable "unless action pursuant to official municipal policy of some nature caused a constitutional tort." *Id.* at 691, 98 S.Ct. at 2036. The court emphasized that "a municipality cannot be held liable solely because it employs a tort-feasor—or, in other words, a municipality cannot be held liable under Section 1983 on a respondeat superior theory. Therefore, . . . a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 691, 694, 98 S.Ct. at 2036, 2037.

Because *Monell* only imposes liability when the deprivation of a civil right results from ". . . a government's policy or custom, whether made by its lawmakers or those whose edicts or acts may fairly be said to represent official policy . . ." 436 U.S. at 694, questions arose as to who beyond lawmakers can set official policy as well as which "edicts or acts constitute official policy." As a result of three decisions in three years, the Supreme Court has provided a framework to answer those questions. In *Pembauer v. City of Cincinnati*, 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986), the Supreme Court stated that "[m]unicipal liability attaches only when the decision maker possesses final authority to establish municipal policy with respect to the action ordered." 475 U.S. at 483, 106 S.Ct. at 1299. Whether an official possesses policymaking authority with regard to a particular matter is a question that will be determined by state law. *Id.* Justice Brennan, writ-

ing for the plurality, however, suggested that state law was only a starting point, and that the policymaker is not the only one who legally has the power, but also includes those who actually exercised the policymaking powers. Under Brennan's view, the factfinder was the one who ultimately would determine in whom actual final policymaking would reside.

In the second plurality opinion, this time written by Justice O'Connor, *City of St. Louis v. Praprotnik*, 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1987), the court rejected the notion that the factfinder was to determine who was the policymaker. It held that the question of who is a policymaker is one of law for the courts to decide by reference to state law. The plurality also stated the importance of who was the final decision maker and the distinction between the authority to make final decisions and the authority to make discretionary decisions. "When an official's discretionary decisions are constrained by policies not of the official's making, those policies, rather than the subordinate's departures from them, are the act of the municipality." *Id.* at 127, 108 S.Ct. at 926. For a subordinate's decision to be that of the governmental entity, the policymakers as determined by state law must affirmatively approve of the subordinate's decisions. "Simply going along with the discretionary decisions of one subordinate ... is not a delegation to them to make policy." *Id.* at 130, 108 S.Ct. at 927.

Finally, in *Jeff v. Dallas Independent School District*, 491 U.S. 701, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989), the court adopted the common elements of *Pembauer* and *Praprotnik* in a majority opinion. In that decision, the court determined that for a local government to be liable:

1. the judge as a matter of law must determine the official or governmental bodies by reference to state law or custom or usage that has the force of state law. *Id.* [491 U.S. at 735–36, 109 S.Ct.] at 2723; and

2. once the judge has determined who is the policymaker, the factfinder determines whether the policymaker's actions deprived them of their civil rights by their policy or acquiescence in a long-standing practice or custom that constitutes

the "standard operating procedure" of the governmental entity. *Id.*

Implementing the principles in *Pembauer, Praprotnik* and *Jett,* the Seventh Circuit in *Auriemma v. Rice,* 957 F.2d 397 (7th Cir.1992), held that a public official that implements a policy at variance with legislative mandates of that entity cannot change policy by acting contrary to that policy. In *Auriemma,* the City of Chicago police chief reshuffled the senior ranks of the Police Department purportedly along racial and political lines but, as here, the City had an ordinance that unequivocally bans racial and political discrimination. The Seventh Circuit held that the actions of the police chief did not establish a policy "because" if, in the course of selecting senior staff, Rice discriminated on account of race and politics, he violated rather than implemented the policy of Chicago. On Rice [not the City] falls the responsibility for his deeds." *Id.* at 401. *See also Wulf v. City of Wichita,* 883 F.2d 842 (10th Cir.1989) (police chief's actions may have violated an employee's first amendment rights and he may be subject to individual liability because the manager was the final policymaker on terminations, the municipality cannot be held liable.)

Just as in *Auriemma,* the final policymaker in this was the City Council when it enacted the Housing Code and the Chief Housing Officer was merely a subordinate. Even if the Chief Housing Officer intended not to send Owners a notice or not to check on the return, that is totally at variance with the final policy set forth in Section 1009.1 of the Wilkes–Barre Housing Code. That section requires notice of demolition to be in writing, a description of the real estate to be included, allowance for a reasonable time for remedial acts to make the property safe before demolishing the building, and notification to the property owner that appeal procedures exist to challenge the notice. The notice is to be sent by certified mail or other methods where, unlike here, when the proper address of the owner cannot be ascertained. If the Chief Housing Officer did not give notice, he violated rather than implemented City policy.

Because the determination as to who is a policymaker is a legal one and, in this case, it is clear that City Council is the final policymaker to determine the notice that should be received, I would reverse the trial court's determination that the Chief Housing Officer was the final policymaker and his actions could impose liability on the City.

## II.

Assuming that the Chief Housing Officer is a policymaker, I disagree that the failure to check to see that Owners received the notice is a policy. The majority finds that the Chief Housing Officer created a policy merely because he cosigned the May 18, 1981 letter to the Owners that their building would be razed unless they complied with the ordinance and did not insure that the notice was received. Contrary to the majority's holding, policy is not a mistake; policy is the deliberate choice of a local policymaker to pursue or not pursue a particular course of conduct. *Praprotnik.* Nothing in the record indicates that there was any intentional policy by the Chief Housing Officer not to send the notice of demolition or not to check to see if notice was received. Failure to check in one instance does not make a policy as the majority holds because a policy requires an intentional act on the policymaker and not, as here, a mistake.

That there is no policy became evident from the testimony of Kenneth F. Eick, the City's assistant administrator that the Owners called on cross. He testified that it was the City's practice at one time to determine whether notice had been perfected prior to letting a contractor demolish a property. (74a.) Moreover, he testified that he did not know of any other case in which notice was not received before this building was razed. Owners, who have the burden of proof, offered no other testimony as to the City's practices in perfecting notice. No policy, no custom,[4] no usage, no Section 1983 liability against the City.

4. Mr. Eick's testimony also establishes that there is no custom not to perfect notice. *Monell* recognizes that a practice in a local government can be "so permanent and well settled as to constitute a 'custom or

### III.

The City also contends that the prior *de facto* taking case decided adversely to the Owners' acts to bar the claim that a Fifth Amendment taking has occurred or at least precludes certain issues in this case. Specifically, the City contends that the trial court's dismissing the *de facto* taking action and finding that the City demolished the building under a Housing Code provision authorizing the building inspector to take immediate action where an emergency conditions exists is res judicata or, at the very least, collateral estoppel offset on the Section 1983 action. The majority declines to apply either of these doctrines because a Section 1983 action is based on theories of trespass and constitutional tort, while in *Balent I,* we only found that there was not an unconstitutional taking. The majority's implication is that Section 1983 itself gives some sort of right different than the underlying federal right that a plaintiff is claiming was denied, and state actions litigating that right do not have preclusive effect.

In *Urbanic v. Rosenfeld,* 150 Pa.Commonwealth Ct. 468, 479, 616 A.2d 46, 52 (1992), we explained that was not the case by stating:

[A] Section 1983 action does not create any substantive rights, but merely serves as a "vehicle or ... 'device' by which a citizen is able to challenge conduct by a state official whom he claims has deprived or will deprive him of his civil rights." Harry Blackmun, Section 1983 and Federal Protection of Civil Rights—Will The Statute Remain Alive or Fade Away?, 60 N.Y.U.L.Rev. 1, 1 (1985). "[O]ne cannot go

usage' with the force of law." 436 U.S. at 692. Unlike a custom where the violation occurs because of actions of the policymaker, a custom is a pattern of conduct undertaken by employees of a governmental body. The "custom or usage" in question will be attributable to the governmental body if it has been in existence for a sufficient length of time that reasonable policymakers knew or should have known that such practices had become customary. *See Praprotnik.* Because it must be a custom, isolated instances of violations by employees are not actionable against the government body. *Carter v. District of Columbia,* 795 F.2d 116 (D.C.Cir.1986). But here, the uncontroverted facts show that no custom or usage exists either not to give notice or not to see that notice has been perfected.

into court and claim a 'violation of Section 1983'—for Sec.
1983 by itself does not protect anyone against anything."
*Chapman v. Houston Welfare Rights Organization,* 441
U.S. 600, 617, 99 S.Ct. 1905, 1916, 60 L.Ed.2d 508 (1979).
In effect, Section 1983 is a form of action akin to mandamus
or equity which requires a party to meet certain threshold
requirements before relief can be granted on the underlying
violation. To maintain a cause of action under Section 1983,
a plaintiff is required to establish only that some person has
deprived him or her of some cognizable federal right; and
deprived him or her of that right while acting under color of
state law. *West v. Atkins,* 487 U.S. 42, 108 S.Ct. 2250, 101
L.Ed.2d 40 (1988); *Gomez v. Toledo,* 446 U.S. 635, 100 S.Ct.
1920, 64 L.Ed.2d 572 (1980); *Flagg Brothers, Inc. v. Brooks,*
436 U.S. 149, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978).

Section 1983 is just the form of the action establishing that
certain preconditions be met to be able to maintain the action
based on a deprivation of a federal right. Just because these
preconditions need to be met and it's a constitutional tort does
not mean, as the majority seems to suggest, that claim or
issue preclusion cannot be applied to a Section 1983 action. If
a claim or a fact has been determined in previous litigation,
the normal rules of claim and issue preclusion [5] determine the

5. Res judicata or claim preclusion is when a former judgment bars a
   later action proceeding on all or part of the very claim which was the
   subject of the former. As now interpreted under res judicata or claim
   preclusion, any final, valid judgment on the merits by a court of
   competent jurisdiction or, in the case of Section 1983 under federal
   law, an administrative proceeding (*see University of Tennessee v. Elliott,*
   478 U.S. 788, 106 S.Ct. 3220, 92 L.Ed.2d 635 (1986)) precludes any
   future suit or action between the parties or their privies on the same
   cause of action. That judgment is conclusive as between the parties
   and their privies in respect to every fact which properly could have
   been considered in reaching the determination, and in respect to all
   points of law, relating directly to the cause of action and affecting the
   subject matter before the court. Claim preclusion applies not only to
   matters which were actually litigated; but also to matters which should
   have been litigated at the first proceeding if they were part of the same
   cause of action.

   Collateral estoppel or issue preclusion deals with an issue determined
   in a first action when the same issue arises in a later action based upon
   a different claim or demand. It forecloses relitigation in a later action
   of an issue of fact or law which was actually litigated and which was

effect that judgment has on a Section 1983 action and vice versa. Federal, e.g., *Kirkland v. City of Peekskill,* 828 F.2d 104, 109 (2nd Cir.1987) (applying claim preclusion as a result of an adverse state proceeding). As well as state courts, e.g., *Swofford v. Stafford,* 295 Ark. 433, 748 S.W.2d 660 (1988) (replevin); *Barnes v. City of Atlanta,* 186 Ga.App. 187, 366 S.E.2d 822 (1988) (mandamus), have applied these doctrines to Section 1983 actions.

Owners are claiming in this action that there was a deprivation of their Fifth Amendment rights because the property was taken without just compensation and without due process required by the Fourteenth Amendment. *Balent I* decided on the merit that a *de facto* taking did not occur. A *de facto* taking case is filed under Section 502 of the Eminent Domain Code, 26 P.S. § 1–502. Section 502 requires that the property owner establish that an entity clothed with the power of eminent domain has taken its property without first filing a declaration of taking. *Appeal of Miller,* 55 Pa.Commonwealth Ct. 612, 423 A.2d 1354 (1980). That's exactly the underlying violation that Owners are required to establish in this action, i.e., that they received no notice and the City took their property. There is no need to decide if issue or claim preclusion applies because both have the same ultimate effect—preventing the relitigation of the underlying constitutional issues on which the Section 1983 action is based. Because the underlying constitutional issues have already been

necessary to the original judgment. Unlike claim preclusion, there is no requirement that there be an identity of parties between the two actions to preclude relitigation of an issue, and issue preclusion may be asserted as either a "sword or a shield" by a stranger to the prior action as long as the party against whom it is asserted was a party or in privity with a party. There is another important distinction between the principles of claim preclusion and issue preclusion. Claim preclusion involves the same claim or cause of action in both the prior and subsequent actions, but issue preclusion operates to prevent relitigation of an issue in a later action based upon a claim or cause of action different from the claim or cause of action previously asserted. Issue preclusion is designed to prevent relitigation of issues which have once been decided and have remained substantially static, factually and legally. See generally, *Hebden v. Workmen's Compensation Appeal Board (Bethenergy Mines),* 142 Pa.Commonwealth Ct. 176, 597 A.2d 182 (1991), *reversed on other grounds,* 534 Pa. 327, 632 A.2d 1302 (1992).

litigated, I do not believe Owners can maintain a Section 1983 action.

Because of the foregoing, I would reverse.